## Staunton

### BUCK v. COMMONWEALTH.

#### November 12, 1914.

1. APPEAL AND ERROR—*Criminal Law—Demurrer to Evidence—Uncontradicted Evidence to be Accepted as True.*—Though a criminal case is to be considered as upon a demurrer to the evidence by the plaintiff in error, he is not required to waive his own evidence as to which there is no conflict or contradiction, and such evidence is to be accepted as true.

2. CRIMINAL LAW—*Accessory after the Fact—What Constitutes—Case at Bar—Suspicions.*—The true test whether one is accessory after the fact is to consider whether what he did was done by way of personal help to his principal with a view to enabling his principal to elude punishment; the kind of help being immaterial. In the case at bar, the evidence fails utterly to prove any act on the part of the plaintiff in error in the way of help to his alleged principal with a view to enabling him to elude punishment. The most that the evidence does is to excite suspicion as to the veracity of the plaintiff in error and to cast doubt upon the account he subsequently gave of his conduct. But suspicion, however grave, does not warrant a conviction. To justify conviction for any offense, the facts necessary to establish guilt must be proved beyond a reasonable doubt.

Error to a judgment of the Circuit Court of Craig county.

*Reversed.*

The opinion states the case.

*W. E. Allen* and *John L. Lee,* for the plaintiff in error.

*John Garland Pollard, Attorney-General,* and *Christopher B. Garnett, Assistant Attorney-General,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

Harvey D. Looney, on the night of June 16, 1912, shot and fatally wounded one Oscar M. Martin, in the town of New Castle, Craig county, and by flight temporarily escaped arrest for his crime. On the following day a justice of the peace of Craig county, upon complaint made to him, issued his warrant for the arrest of B. W. Buck, charging that Buck had "received, harbored, maintained and concealed the said Harvey D. Looney, and that he, the said B. W. Buck, has assisted the said Harvey D. Looney in escaping and evading arrest for the said felony committed by him." Buck was arrested and brought before the justice on the date of the warrant, but the case was continued from time to time until August 30, 1912, when a trial was had and judgment rendered against the accused that he be confined in the jail of Craig county for a term of six months and pay to the Commonwealth of Virginia a fine of $300, from which judgment Buck appealed to the Circuit Court of Craig county, and upon a trial of the cause before a jury in the circuit court, on November 14, 1912, Buck was found guilty and his punishment ascertained to be a fine of $450 and confinement in the county jail for ten months, upon which verdict the circuit court entered judgment, and to which judgment a writ of error was awarded to the defendant by this court.

The only assignment of error requiring consideration relates to the action of the trial court in overruling plaintiff in error's motion to set aside the verdict of the jury as contrary to the law and the evidence, and in entering judgment thereon.

The only evidence relating to the alleged connection of plaintiff in error with the temporary escape of Looney after the latter had, about eleven o'clock on the night of

June 16, 1912, fatally shot and wounded Oscar M. Martin, the town sergeant of New Castle, consists exclusively of plaintiff in error's own evidence given upon his trial in the circuit court, his own statements made the morning after the shooting as related by Wiley Martin, a brother of Oscar Martin who had died during the night, and G. W. Layman, witnesses for the Commonwealth; and the evidence of Lee Looney, the brother, and Henry Looney, the father of Harvey Looney, also witnesses for the Commonwealth, the two latter testifying as to what transpired when plaintiff in error and Harvey Looney arrived at the home of the father about an hour after the shooting of Oscar Martin.

It appears that Harvey Looney was in the town of New Castle, drunk and very disorderly, on the afternoon and evening that he shot Martin, who made an effort to arrest him; that plaintiff in error resided at New Castle and had been acquainted with Looney for about four years, and had seen him at New Castle several times in the afternoon preceding the night of the shooting. During that afternoon, on more than one occasion, Looney had cursed and abused plaintiff in error very violently, as he had done others in his drunken frenzy. That evening plaintiff in error, as was his custom, went to Craig City, only a few minutes walk from New Castle, to look after some horses which he kept there, and the substance of the statements made by him upon his trial in the circuit court is as follows: He turned out three of his horses in a little field to graze, and left two in the stable. A little later, because of a threatening storm, he tried to catch one of the horses, a sick one, which he had turned out, but failed. While so engaged, and when near a Mr. Caldwell's house he heard five shots fired. Failing to catch the horse and a storm coming up, he started back to New Castle. When "between the bridges" he met

Harvey Looney "running very fast.". He hailed him, saying "Who is that?" and Looney replied, "Is that you, Ben?" Upon being answered "Yes," Looney said, "Don't you move. I have got you covered and my finger on the trigger." Looney then passed him a few feet, whirled, put a pistol at his breast and demanded that he get him (Looney) a horse, saying he was in trouble and that if he (Buck) did not get him a horse he would kill him; that although he (Buck) had two horses in the stable, he told Looney he had none, that they were turned out. Looney then demanded with a threat to kill if disobeyed that he (Buck) catch one for him; that he (Buck) got a bridle out of the corn crib and pretended to try to catch one of the horses, but struck him on the nose so that he whirled and ran away; whereupon Looney cursed him, saying that he had not tried to catch the horse, and then with violent threats and a pistol still in hand said that he could get a horse at home and that he (Buck) had to go with him or he would kill him, for if he left him behind he would tell on him (Looney); that he (Buck) tried to beg off, but was compelled to go, and on the way to the home of Looney's father he demanded that he (Buck) give up his pistol, which he did; that Looney told plaintiff in error that he had shot Oscar Martin and when the Looney home, about one and a half miles from New Castle, was reached, Looney awoke his brother, Lee Looney, told him he was in trouble and demanded a horse upon which to get away. Lee Looney got up, caught, bridled and saddled a horse which Harvey Looney, after providing himself with food and some money gotten from his mother, mounted and rode away. This was at a late hour, about midnight or after, and plaintiff in error spent the remainder of the night at the Looney house, returning to New Castle early in the morning.

No one saw plaintiff in error and Looney when they met after the latter had shot Oscar Martin, or at any time while they were together that night, or heard a word that passed between them while they were on their way to the Looney home. When the Looney home was reached, and while Looney was getting something to eat. and his money, about an hour after the shooting, plaintiff in error told Harvey Looney's brother, Lee, that he (plaintiff in error) had been forced "at the point of a gun," to accompany Harvey Looney to his father's home to get a horse, which fact is testified to by Lee Looney, and both he and his father, testifying for the prosecution, say that plaintiff in error, after reaching their home, did nothing whatever to aid or encourage Harvey Looney in making his escape. These witnesses also testify as to Harvey Looney's drunken condition and that plaintiff in error had reasonable apprehension of being shot if he had refused to accompany him to his father's home to get a horse; Lee Looney stating that he regarded it safest to let Harvey Looney have the horse, etc.

At an interview sought by plaintiff in error with Wiley Martin, G. W. Layman and several others the next morning after the shooting, he undertook to relate to these men just what had occurred between him and Harvey Looney the night before, and while Wiley Martin and Layman, when testifying for the prosecution, make it appear that the statement then made by plaintiff in error did not accord altogether with his testimony given in court, there is not any material difference in the two statements. On the contrary, the statement made by plaintiff in error at that interview, as testified to by Wiley Martin and Layman, corroborates rather than discredits the statements made by plaintiff in error in court. Not only so, but both the witnesses say that they

can only give in substance the statement voluntarily made by plaintiff in error in Judge Jones' office in the presence of themselves, Judge Jones and others. Wiley Martin states that plaintiff in error said to him that morning: ''I want to have a talk with you, George Layman, Judge Jones and Ed. Smith, altogether; I think I can give you a few points.'' ''I (Martin) says, 'All right, Ben, I will appreciate any information we can get!'' Layman testifies that plaintiff in error informed him also of the proposed interview in Judge Jones' office. As stated, Martin and Layman, as witnesses for the prosecution at the trial of plaintiff in error related the statements made by him in their presence and in the presence of Ed. Smith and Judge Jones, in the latter's office. While the statements made by these witnesses, as to what plaintiff in error on that occasion said, go more into detail as to what his statement was than he did when testifying in court, there is practically no conflict between the two statements made by him with respect to the material facts being inquired into. The matter being inquired into was, had plaintiff in error personally helped Harvey Looney in escaping or evading arrest for the felony committeed by him—that is, the fatal wounding of Oscar Martin. There was some evidence offered for the prosecution for the purpose of contradicting some of the statements made by plaintiff in error in Judge Jones' office, which evidence had reference to certain statements made by plaintiff in error upon his return to New Castle the next morning after the shooting, and to the effect that he had not before that time known of the shooting of Oscar Martin, when in fact Harvey Looney had told him on the way to his father's home that he had shot Martin. The witnesses for the prosecution say that there was the greatest excitement among the citizens of New Castle after this shooting, and though plaintiff in error may have stated

to certain persons that he had not known of the shooting until that time, the fact remains that he sought the brother of the man that had been shot, and through him and George W. Layman arranged a meeting with them and others in Judge Jones' office before whom he proposed to and did relate what he knew about Looney's escape, the purpose of which could have only been to assist the officers of the law in their efforts to bring about the capture of the escaped culprit. To give all the evidence in contradiction of plaintiff in error the fullest weight, it at most could only serve to excite suspicion as to his veracity, and cast doubt upon the account he subsequently gave of his conduct. But suspicion, however grave, does not warrant a conviction. To justify a conviction for any offense, the facts necessary to establish guilt must be proven beyond reasonable doubt.

There is no evidence whatever in the record tending to prove a motive on the part of plaintiff in error in committing the offense with which he is charged, and it is to be borne in mind that the voluntary statements he made to others in Judge Jones' office and testified to at his trial constitute the only proof in the case as to what occurred between the time of his meeting with Looney "between the bridges," after the shooting of Oscar Martin, and the time at which Looney rode away on his father's horse from the Looney home, and as to which statements there is no contradiction whatever.

Nor is there the slightest intimation in the record that plaintiff in error entertained any unkind feeling toward Oscar Martin, deceased, or that he had any reason to even feel kindly toward Looney who, as it affirmatively appears in the record, had violently cursed and abused him but a few hours before the shooting of Martin, and without provocation.

Though the case has to be considered as upon a demurrer to the evidence by plaintiff in error, he is not

required to waive his own evidence as to which there is no conflict or contradiction, and such evidence is to be accepted as true.

In *Wren* v. *Com'th*. 26 Gratt. (67 Va.) 952, the question as to what proof is necessary to convict one charged with the offense of which plaintiff in error here stands convicted in the circuit court is very fully discussed, and the court said: "The true test whether one is accessory after the fact is to consider whether what he did was done by way of personal help to his principal with the view to enabling his principal to elude punishment; the kind of help being unimportant."

In the case here, the evidence, as we view it, fails utterly to prove any act on the part of plaintiff in error in the way of help to Looney with a view of enabling him to elude punishment. The prosecution itself proved that early next morning he reported the escape of Looney, when and by what means he had left the vicinity, and it is not proven that plaintiff in error did anything whatever by way of personal help to Looney with the view to enabling him to elude punishment. All that he did according to the proof, was to go with him, under duress, from a point "between the bridges" to the Looney house, where the Looneys provided all the means necessary for him to make a temporary escape, without any sort of assistance from plaintiff in error. Had the latter not reported the escape of Looney to the authorities, his failure would not have constituted the crime charged against him, or any crime. *Wren v. Com'th, supra.*

We are of opinion that the judgment of the circuit court complained of should be reversed, the verdict of the jury set aside, and the cause remanded for a new trial, if the circuit court and prosecuting attorney consider that a better case against plaintiff in error can be made out.

*Reversed.*