# Richmond

STANDARD OIL COMPANY, A CORPORATION, ETC. V. ROBERT GRAY DAVIS, AN INFANT, ETC.

January 14, 1932.

Present, Campbell, C. J., and Epes, Hudgins and Browning, JJ.

Upon Rehearing.

The opinion states the case.

*Thomas B. Gay* and *Irvin G. Craig*, for the plaintiff in error.

*John R. Saunders, Attorney-General, W. D. Evans* and *Leon M. Bazile*, for the defendant in error.

CAMPBELL, C. J., delivered the opinion of the court.

### UPON REHEARING

This case was decided by this court at its March term, 1931, and the judgment of the circuit court was affirmed.* A rehearing was granted, and in this way the case is again before this court.

It is a proceeding by notice of motion in which the plaintiff, Robert Gray Davis, an infant, recovered judgment in the circuit court against the Standard Oil Company, a

---

*The opinion then delivered was withdrawn and will not be reported.

corporation, and Roger A. Callis, defendants, in the sum of $15,000.00. The correctness of that judgment is here questioned by the company.

The material allegations of the notice of motion are: That the Standard Oil Company was the owner and operator of a certain gasoline tank, in which it had placed, or caused to be placed, gasoline, a dangerous and highly explosive substance; that it desired to have the tank removed from the town of Urbanna, in Middlesex county, to the town of Port Richmond, in King William county; that thereupon, without draining the gasoline from the tank and without washing the tank in order to safeguard it from explosion, it directed Roger A. Callis, who was at the time a servant, employee, or agent, of the company, to remove the tank as desired; that Callis, the agent, employee, or servant, of the company, did remove the tank from Urbanna to the premises of R. H. and Emma Clements, preparatory to transporting it to Port Richmond, and permitted the tank containing a large quantity of gasoline to remain therein, uncapped, and opened sufficiently to permit vapor from the gas to escape; that it was the duty of defendants, before removing the tank, to drain and wash it out; that the company was guilty of negligence in leaving the tank thus exposed to ignition; that the plaintiff was on the premises of Clements, where he had a right to be, for the purpose of gathering fodder; that while the tank was in the custody of the defendants, without fault of plaintiff, it was ignited by a spark; that as a result of the explosion plaintiff's skull was fractured, his body severely burned and permanently disfigured.

The company filed, under oath, its petition, which in substance was a special plea denying that the removal and transfer of the gasoline tank, as set forth in the notice of motion, was such an operation as was inherently dangerous; denying that Callis was its servant, employee, or agent;

and alleging affirmatively that Callis, in the removal and transfer of the tank, occupied the position of independent contractor.

The prayer of the petition or plea is as follows: "Wherefore your petitioner says that it has been improperly joined as a codefendant in this action with the said Roger A. Callis, and prays that it may be dismissed as a party to the within action."

Plaintiff thereupon filed, under oath, a replication to the petition or plea, denying all of its allegations.

■ The trial court, over the objection of the plaintiff, held as a matter of law that the removal and transfer of the tank, as alleged in the notice of motion, was not an inherently dangerous operation. The court being further of opinion that the petition or plea and the replication thereto presented an issue of fact and not a pure question of law, over the objection of the company, empaneled a jury and submitted to it the issue of whether or not Callis was an independent contractor. At the conclusion of the taking of evidence on the issue raised by the special plea, without objection, the court gave the following instructions:

"The court instructs the jury that a person who is skilled in the performance of a particular kind of work, and who, on account of his skill, is employed to do a piece of work, without restriction upon the means to be employed in doing the work, and who employs his own labor which is subject alone to his control and direction, and undertakes to do the work either according to his own idea, or in accordance with the plans furnished by the persons for whom the work is done, is an independent contractor, and the fact that his compensation is measured by a fixed sum per hour to himself and those employed by him, or that the owner furnishes material for the work, does not affect the status of such person as an independent contractor.

"2. The court further instructs the jury that if they

believe from the evidence that Roger A. Callis was a person skilled in the work of removing gasoline storage tanks such as the one involved in this case, and who, on account of such skill, was employed by the Standard Oil Company to remove the storage tank in question, without restriction upon the means to be employed in doing the work, that Callis employed his own help which was subject alone to his control and direction, and that Callis undertook to do the work either in accordance with his own ideas or according to the directions given by the Standard Oil Company, then Callis was an independent contractor and the fact that Callis was paid a stated price per hour for his services and those employed by him, and that the Standard Oil Company furnished him materials for the work, would not render Callis an employee of the Standard Oil Company.

"3. The court instructs the jury that when the contract between the two parties is not in writing, in determining whether one is an independent contractor, or a servant, or employee, the terms of the contract of employment and all the facts and circumstances in the case are to be considered by the jury in determining the fact whether or not the Standard Oil Company of New Jersey and R. A. Callis so contracted as to make Callis an independent contractor within the meaning of the law as given you in the other instructions of the court.

"4. The court instructs the jury that if you do not believe from the evidence that R. A. Callis was an independent contractor as defined in the other instructions of the court; and if you further believe from the evidence that R. A. Callis did, on the order of E. C. Fox, agent for the Standard Oil Company of New Jersey, undertake to move the tank referred to in the evidence, you are instructed to find that Callis was a servant of the Standard Oil Company of New Jersey.

"5. The court instructs the jury that the burden rests

upon the defendant to establish by a preponderance of the evidence, in the manner set out in the preceding instructions of the court, that the defendant Callis was an independent contractor and not the servant of the defendant the Standard Oil Company."

Upon the issue joined, the jury returned this verdict:

"We, the jury, upon the issues joined, find that Roger A. Callis was not an independent contractor with the Standard Oil Company of New Jersey, but was the servant of said Standard Oil Company."

A motion to set aside the verdict was overruled, and thereupon the company filed its plea of not guilty and also filed its grounds of defense. Callis failed or refused to plead the general issue, but the case was proceeded with as though a plea of not guilty had been filed by him. Another jury was empaneled, and the trial resulted in a verdict in favor of the plaintiff in the sum of $15,000.00 against the company, the effect of which was to find in favor of Callis.

A motion was then made by plaintiff's counsel to set aside the verdict in favor of Callis, and enter judgment against him as well as the defendant company. The motion was sustained and judgment pronounced against both defendants.

On the three questions: (1) The negligence of Callis, (2) the severity of plaintiff's injuries, and (3) that the plaintiff was without fault, the evidence is so conclusive that not even a doubt can be entertained.

No contention is made that the damages are excessive.

The errors assigned are:

"1. The court erred in overruling your petitioner's motion to set aside the verdict and enter judgment in its favor on the ground that the undisputed evidence showed that its codefendant, Roger A. Callis, was an independent contractor for whose negligence, if any, it was in no way responsible.

"2. The court erred in admitting the testimony of Fox and Hill Clements in regard to a statement alleged to have been made by Fox to Hill Clements, subsequent to the explosion of the tank, to the effect that he (Fox) would employ a nurse for Leonard Clements, since he was hurt by the company.

"3. The court erred in admitting the testimony of Callis in regard to work done by him on a gasoline pump at Locust Grove farm at the request of the company's representative, Thrift, on the day following the removal of the tank from Richwine's service station.

"4. The court erred in admitting the testimony of Roland Davis and Hill Clements in regard to an alleged request, made by Fox of Roland Davis, to furnish him with a written statement as to how the explosion occurred.

"5. The court erred in refusing to grant your petitioner a new trial on account of the improper admission of the testimony referred to in the three foregoing assignments of error."

It is to be observed that the first assignment of error relates not only to the alleged errors committed by the trial court upon the trial of the first issue, but relates also to the alleged errors committed upon the trial of the second issue. This is borne out by the following statement in the defendant's petition:

"The court's action in this respect was the final of its several rulings against your petitioner's contention that it had been shown by uncontradicted evidence that Callis was an independent contractor for whose negligence, if any, it was in no way liable. The point was saved by your petitioner at several stages during the trial: *First*, when the court overruled its motion to be dismissed as a party defendant, made at the conclusion of the testimony given before the jury impaneled to try that issue; *second*, when the court overruled its motion to set aside the special verdict and

enter its order dismissing it as a party defendant; *third*, when the court overruled its motion that it be dismissed as a party defendant, made at the conclusion of the taking of the testimony on the trial on the merits before the second jury; *fourth*, when the court refused to grant the instructions offered by your petitioner which would have submitted the issue to the second jury; and *finally*, in the instance first assigned, when the court overruled your petitioner's motion to set aside the verdict of the second jury as contrary to the law and the evidence and without evidence to support it, and to enter up judgment in its favor, and entered up judgment on the verdict against your petitioner."

It is contended by counsel for the plaintiff, that while the transcript of the record of the first proceeding is copied into the printed record, it is not legally a part thereof, because not certified within the time prescribed by law.

While we entertain doubt on the question, in our view the proceedings of both trials are so interwoven that it is essential for a proper disposition of the case to consider the entire record as we have it. This conclusion, it seems to us, is demonstrated by the record. Though the jury trying the first issue found that Callis was the servant of the company, it was contended by counsel for the company during the progress of the second trial that "this case cannot proceed before this jury without proof of the relationship between Callis and Standard Oil Company." The trial court concurred in the contention of counsel for the company. Thus, during the progress of the two trials we have the company striving to carry the burden of showing that Callis was an independent contractor, while the plaintiff was striving to carry the burden of proving the facts on which the agency exists.

To sustain the burden imposed by law upon it to show that Callis was an independent contractor, the company introduced as witnesses E. C. Fox and Callis. A summary

of their testimony, taken from the brief of counsel for the company, is as follows:

"The witness, E. C. Fox, testified as follows: That for nearly five years he had been employed as the general salesman of the Standard Oil Company of New Jersey in the territory contiguous to Urbanna, Virginia; that it was a part of his duty as general salesman to arrange for the installation and removal of gasoline storage tanks at service stations of the company's customers in that territory; that his duty did not involve the supervision of the work but the arranging to have it done for the company by a contractor; that it is customary for the company to find a man capable of handling the work, to make arrangements with him to handle it at an agreed price and to turn the work over to such party.

"That some two or three years previous he had made an arrangement with Roger A. Callis to do this kind of work for the company in his territory; that Callis ran a store at Stormont and did general electrical contracting work; that he made the following arrangement with Callis in regard to doing the work for the company: the company was to pay $1.00 an hour for his time, which took care of his transportation from place to place where the work was to be done; Callis was to employ his own helpers to assist him in the work, and if he had to have a dray for hauling was to employ the drayman himself; if it was necessary to have extra materials Callis was to purchase them himself; he was to get receipts from his helpers, from the drayman and from the parties from whom he purchased materials, and present them along with his bill to Fox who would in turn forward them to the Richmond office for payment; the company stipulated that the helpers' wages should not exceed fifty cents per hour, but left it to Callis to effect the best arrangement possible as to the drayman; the company was to have no jurisdiction over whom Callis hired or when he hired them

and to exercise no supervision over Callis in the way that he did the work; the only directions given Callis were that he should drain a used tank of gasoline, wash it out if possible and in every case cap or plug the openings in the tank to prevent escape of gasoline vapors;

"That the foregoing arrangement was made with Callis personally; that after the making of the arrangement the company would call Callis and advise him that it wanted a certain piece of work done; that Callis would sometimes say: 'I will not be able to do it tomorrow, I have to take my wife to Richmond;' or that he had some other job on hand, wiring a house or something of the kind; or that 'I will do it as soon as I can;' that during the period of two or three years that the arrangement had been in effect Callis had made several hundred installations and removals of tanks without injury or accident and that his work had been very satisfactory—the best he had ever done by anybody;

"That two or three days prior to October 2, 1928, he found that it was necessary to have two of the company's underground gasoline storage tanks removed from the Richwine Service Station at Urbanna, Virginia; that one of the tanks was to be installed at a station next door to Richwine's and the other at a station at Port Richmond, Virginia; that he called Callis on the 'phone, outlined to him what had to be done and asked him to remove the tanks, as he had been doing before; that Callis undertook to do the work under the terms of the arrangement that he had previously made;

"That he was not present on October 2, 1928, when the tank in question was removed from Richwine's station; that he did not know when Callis went to Richwine's to do the work, and that he undertook to exercise no supervision over Callis in the way he did the work.

"The witness, Roger A. Callis, testified as follows:

"That he was forty-two years old, and that he had oper-

ated a store at Stormont, Virginia, for about five years; that he had been doing electrical work practically all his life, and that in addition to running his store he did contract work outside, electrical contract work, installation work and various other kinds of contract jobs;

"That he had heard the statements of the witness, Fox, as to the nature of the arrangement made with respect to installing and removing tanks and that they were correct; that under the arrangement he was to receive $1.00 an hour for his services, which covered his transportation to and from his place to the place the work was to be done; that he was to employ his own helpers and pay them in accordance with his own agreement with them; that he did not recall the limitation of fifty cents an hour to such labor as stated by Fox, but that as a matter of fact he had never paid more than that to a helper; that he was to employ his own drayman, paying him such sum as was necessary to get the hauling done and was to purchase such materials as were necessary for the work; that he was to get receipts from his helper, the drayman and the party furnishing the materials and present them along with his bill to the company for payment; that he had no directions from the company with respect to the work of removing its tanks other than that he should drain the gasoline from them, wash them out if possible, and cap or plug them to prevent the escape of vapors; that the company was not to exercise any supervision or control over the persons employed by him to help or over the persons employed to do the hauling for him as draymen;

"That he had been acting under the foregoing arrangement for about three years and during that time he had removed and installed several hundred tanks without accident or injurious consequences; that it was his custom in doing the work to remove the pipes from a tank and cap or plug it at the joint on top of the tank; that he had obtained most

of the plugs necessary for this operation from tanks sent to him for installation by the company, but that when he had no plugs from that source he would purchase them himself, get a receipt and be reimbursed by the company; that it was his custom to employ Leonard Clements, a drayman with a truck of his own, who did a general hauling business, to move the tanks for him; that in some cases he would pay Clements a fixed sum for the job and in others would pay him a stated sum for the time the truck was in transit and a lesser sum per hour while Clements was waiting around and doing little things about helping him; that he would pay his helpers and draymen and send the receipted bills to the company and that sometimes those persons signed the receipts before he paid them in order that he might get the money from the company; that he had instructed everyone who worked for him to be very careful about lighting matches near the tanks, or striking the tanks with chisels or hammers;

"That several days prior to October 2, 1928, Fox called him over the 'phone and requested him to move two underground gasoline tanks from the Richwine Service Station at Urbanna, advising him that one was to be installed at the station next door, the other to be moved to Port Richmond and installed at a station there, and that the pumps were to go to the Taylor Motor Company at Urbanna; that he undertook the Richwine station work under the same terms as had been the general custom and expected to be paid in the same manner by the company; that no definite time was specified within which he should do the work;

"That on October 2, 1928, he employed Francis Bennett as a helper and Leonard Clements as a drayman, and with them went to Richwine's place to do the work; that the company did not undertake to exercise any control over him or the persons employed by him in doing the work; that Fox

specified no time when the work was to be done and was not notified of the change of place as to when the tank was to be removed to Port Richmond."

It is contended by the company that "plaintiff's counsel introduced no witness to rebut this testimony of Fox and Callis as to the nature of the arrangement made between them, and the manner in which the work was to be done by Callis." In the very nature of things this was an impossibility, as only Fox and Callis, it appears, knew of the alleged agreement. Thus handicapped, plaintiff necessarily had to rely upon such facts and circumstances as were available. These may be thus summarized:

The alleged agreement between Callis and the company was made two or three years before the accident occurred; Callis was directly interested in the result of the trial; Fox was an employee of the company; both of them were contradicted on material matters affecting their credibility. It further appears that the company reimbursed Callis for money expended by him in removing gasoline tanks; that the company paid for any extra material bought by Callis; that during the period of the alleged agreement Callis did certain electrical work for the company under a separate written contract; that while engaged in removing the tank involved Callis was requested by one, Thrift, an employee and agent of the company, to engage in other work for the company; that Callis desisted in the removal of the tank and performed the work as requested by Thrift.

There was no special contract between the company and Callis to remove the tank in question. The most that can be said is that Fox and Callis testified that this particular tank was to be removed under the terms of the general agreement made two or three years prior thereto.

The trial court, under the facts and circumstances proven, was right in submitting to the jury for its determination the question whether or not Callis was an independent

contractor. While, as stated, "no witness" contradicted the statement of Callis as to the terms of the agreement, it plainly appears that Callis did make contradictory statements directly affecting his credibility. As a witness he stated that he knew that gasoline was in the tank at the time of removal and that he intended to drain it out. In an affidavit made a few days after the explosion, and which was introduced by the company, Callis made the statement that the "tank was well drained before it was put on the truck." The affidavit was made for the purpose of relieving Callis of the imputation of negligence. It was in direct conflict with his evidence and was impeaching evidence of the highest order. The jury was not bound to accept as true the statements of Fox and Callis.

In *Metropolitan Insurance Co.* v. *Botto*, 153 Va. 479, 143 S. E. 625, 628, 154 S. E. 603, the rule laid down by Keith, P., in *Clopton's Case*, 109 Va. 818, 63 S. E. 1022, 1023, is approved. In the *Insurance Company Case* we read: "It is true as a general proposition that the evidence of an unimpeached witness, if not inherently incredible, should be believed; but the fact that a witness has not been impeached —employing the term in its common acceptation—is not conclusively binding upon the jury. The jury are the judges of the credibility of the witness and they have the right to determine from his appearance on the stand, his manner of testifying, his candor and fairness, his contradictions, if any, what weight shall be given to his evidence. *Horton's Case*, 99 Va. 855, 38 S. E. 184."

The refusal of the court to instruct the jury, on the second trial, that Callis was an independent contractor is correct, and the assignment is without merit.

It is assigned as error that the court erred in admitting the testimony of Fox and Hill Clements in regard to a statement alleged to have been made by Fox to Hill Clements, subsequent to the explosion of the tank, to the effect

that he (Fox) would employ a nurse for Leonard Clements, since he was hurt by the company.

■ It is also assigned as error that the court erred in admitting the testimony of Roland Davis and Hill Clements in regard to an alleged request made by Fox to Roland Davis, to furnish him with a written statement as to how the explosion occurred.

We do not think this evidence irrelevant and immaterial. Fox was practically the main reliance of the company in seeking to establish that Callis was an independent contractor, by virtue of a verbal contract entered into two or three years prior to the accident. He reiterated his statements on the second trial. Therefore, it was competent for the plaintiff to show that he had made contradictory statements.

In admitting the evidence complained of, the trial court instructed the jury that it could only consider it as affecting the credibility of Fox and not as evidence affecting the question of independent contractorship.

Upon the whole case we are of opinion that the judgment is plainly right; therefore, it is affirmed.

*Affirmed.*

Epes, J., dissenting.

On the original hearing I concurred in the conclusion of the court that the judgment of the trial court should be affirmed; but upon re-examination of the record upon the rehearing, I have been convinced that I was in error in my judgment. I am now of opinion that the judgment of the trial court should be reversed.

In this action Davis sued Roger A. Callis and the Standard Oil Company for personal injury resulting from the negligence of Callis in moving a large gasoline tank. The declaration alleges that Callis was acting as the agent of the Standard Oil Company, and is liable under the doctrine of *respondeat superior*.

The Standard Oil Company filed its petition in which it denied that Callis was its agent, alleged that he was an independent contractor employed by it to move this tank, and prayed that it be dismissed as having been improperly joined in the action with Callis.

On the motion of the Standard Oil Company a jury was impaneled on May 29, 1930, and this single issue was submitted to it, upon the evidence introduced before it. On June 30, 1930, the jury returned a verdict finding that Callis was not an independent contractor and was the agent of Standard Oil Company; and was thereupon discharged. The Standard Oil Company then moved the court to set aside the verdict of the jury on the ground that it was without evidence to support it, which motion the court overruled.

After the verdict returned by the first jury, the Standard Oil Company then pleaded the general issue, and though Callis filed no plea, the case was further proceeded in as if he also had plead the general issue. On the same day, May 30, 1930, a new jury was impaneled and the case was tried on the general issue. Upon the evidence introduced in the trial of the general issue, the jury returned the following verdict: "We, the jury, find for the plaintiff and fix his damages at $15,000.00."

Counsel for plaintiff then suggested that the verdict might be uncertain as to whether it was a verdict against one or both defendants. The court then remarked: "I think it is against both," and upon the motion of the plaintiff, the court instructed the jury, says the record, "to return to their room and state in their verdict whether the verdict was against one or both of the defendants." The jury having returned to their room to further consider their verdict, returned into court with the following verdict: "We, the jury, find for the plaintiff upon the issues joined, and assess his damages at $15,000.00 against the Standard Oil Company." The Standard Oil Company then moved

the court to set aside the verdict against it and enter final judgment for it, on the following grounds:

"(1) Because of the improper admission and exclusion of evidence by the court during the trial of the case;

"(2) Because of misdirection of the jury by the court as to the law of the case;

"(3) Because the verdict is contrary to the law and the evidence;

"(4) Because the verdict is excessive;

"(5) Because it is against the Standard Oil Company alone and not against both defendants."

And the plaintiff moved the court to set aside the verdict "in favor of Roger A. Callis," because the verdict in not finding against Callis as well as the Standard Oil Company is contrary to the law and evidence and without evidence to support it; and further moved the court to enter judgment in its favor against both Callis and the Standard Oil Company for $15,000.00, the amount of damages ascertained by the jury.

The court overruled the motion of Standard Oil Company, but sustained the motion of the plaintiff, and rendered final judgment in favor of the plaintiff against both Callis and the Standard Oil Company for $15,000.00.

At the time this case was first considered by the court, I was under the impression that the evidence introduced upon the issue presented to the first jury (was Callis an independent contractor or the agent of Standard Oil Company?) was not in the record; and that the only evidence contained in the record was the evidence introduced before the second jury upon the trial of the plea of the general issue. In this I was mistaken.

A part of the evidence contained in the record is the evidence introduced before the first jury, and a part of it is the evidence introduced before the second jury.

The court in its opinion on the rehearing expresses some

doubt as to whether the evidence introduced before the first jury has been properly certified by the judge, though it seems to consider it. On this point I have no doubt. I think this evidence has been sufficiently certified by the judge not only to permit but to require its consideration.

On the trial of the issue of independent contractor or agent, the only evidence introduced was the testimony of E. C. Fox, a general salesman of the Standard Oil Company, and R. A. Callis, the defendant whose negligence is the basis of this action, who were introduced by the Standard Oil Company. The plaintiff put on no testimony whatever.

Below I quote every scintilla of testimony introduced on the trial of this special issue which has the remotest bearing upon whether Callis was an independent contractor or the agent of the Standard Oil Company, or which can by any stretch of imagination be supposed to have any possible tendency to impeach or cast suspicion on the testimony of these, the only two witnesses introduced. In order that I may be absolutely sure that I have not omitted something that the court may have deemed to have some bearing on the question here in issue, I have included much testimony which, in my judgment, might with propriety have been omitted:

*Direct Examination of E. C. Fox.*

"Q. Is it a part of your duty as general salesman in the territory contiguous to Urbanna to arrange for the installation and removal of storage tanks at any service stations of customers who buy gasoline in quantities?

"A. Not to supervise the work, but to arrange it.

"Q. What are your instructions from the company as to how such an arrangement should be made?

"A. We make arrangements with the man to carry out the contract and pay him so much to do this work, and turn it over to him after the arrangements have been made and find that he is a man capable of handling it, or we think he is capable of doing it.

"Q. Who does that work for the company in the territory contiguous to Urbanna?

"A. Mr. R. A. Callis.

"Q. How long have you been dealing with him in work of that kind?

"A. I would say approximately around three years—two and a half or three years.

"Q. Could you approximate, Mr. Fox, in a way satisfactory to yourself, how many installations or removal of tanks Mr. Callis had made for the company during that period?

"A. Well, I couldn't say how many; no, sir. I would say possibly around 150 or 200 and possibly as many as 250.

"Q. When Mr. Callis was employed to do this work, what were the terms of your contract with him?

"A. I had arranged with Mr. Callis (there was no written contract) whereby we agreed to pay him $1.00 an hour for his time, which took care of his transportation from his place to the place where he did the work, and we would pay him for a helper—that is, that he would pay the helper himself and get a receipt from him, but the helper's wages were not to exceed fifty cents an hour, and, of course, if he had to buy extra material on the job he paid for that and got a signed receipt from whoever he bought material from. If he had to have a dray to haul it any distance, he hired the dray himself. We had no jurisdiction over who he hired, or when he hired him, when he was on the job, and he paid the drayman and would also get a receipt from him. Then, of course, whatever he produced receipts for, we reimbursed him to the amount of money that he had advanced on the job.

"Q. Did you make an arrangement with Mr. Callis to remove a tank, two tanks, on the 2nd of October, 1928, I think it was, from the property of Mr. Richwine, in Urbanna?

"A.   Yes, sir.

"Q.   Was the arrangement you made with him at that time the same as you just described?

"A.   Yes, sir; the same arrangement I just described.

"Q.   How was the arrangement made—personally or how?

"A.   I just asked him if he would take up these tanks at the Richwine place.  One was going to one place and one to another, and I gave him the outline, and to remove them as he had been doing before.

"Q.   You gave him instructions to take up the two tanks, and told him where you wanted them carried?

"A.   Yes, sir.

"Q.   Do you recall where the tanks were to be carried?

"A.   One tank was to be removed a very short distance— the other tank, when he delivered that, was to go to Mr. F. C. Robbins, of Port Richmond.

"Q.   Were you present when the work of removal was done?

"A.   No, sir.

"Q.   Was any representative of the Standard Oil Company present?

"A.   Not that I know of.

"Q.   You undertook to exercise no supervision over Mr. Callis in the way that he did the work?

"A.   No, sir; absolutely none.

"Q.   Had Mr. Callis's work, during the period of time you said that he had been employed in doing similar work, been satisfactory in its results?

"A.   Very satisfactory—the best I ever had done by anybody.  I never had to send him back for leaks or anything.

"Q.   When one of these tanks is removed, what is it customary to do?

"A.   When the tank is removed, of course it is taken out, and it is customary to plug the openings.  We plug them

and take off the pipes, when the tank is taken from the ground, and take them off right at the tank and plug them up. Most of them used here are screw plugs.

"Q. If a screw plug is not available, can any other object be used?

"A. You can use wooden plugs; yes, sir.

"Q. From your experience in the handling of those tanks, are you able to state to the jury whether, after a tank has been removed, its pipes are plugged up, it is a safe thing for a person to handle?

"A. Yes, sir. After it is plugged, absolutely. There is no reason why it should not be.

"Q. You say Mr. Callis has removed probably 200 or 250 of them?

"A. I would say so; yes, sir.

"Q. Have you ever had any dangerous or injurious consequences result from handling them in the manner in which you describe?

"A. No, sir; we never have.

### Cross-Examination of E. C. Fox.

"Q. You say Mr. Callis has been removing tanks for you and the Standard Oil Company two or three years?

"A. Yes, sir; something like that. I don't know just the date that he started.

"Q. You had a general understanding with him that whenever you wanted a tank removed, you would notify him?

"A. Of course he would not go out here and take up one of our tanks unless we did tell him. Of course, he wouldn't go out and take up tanks promiscuously.

"Q. You did have a general understanding, whenever you wanted a tank removed, that you would notify him and he would remove it?

"A. Yes, sir.

"Q. During that period of two or three years, did you ever get other people to remove tanks?

"A. It may be during that time that there were one or two tanks removed by some other people. I do not know about moving any that I made any arrangement with. In fact, I have never made any arrangement with any one except Mr. Callis in this territory.

"Q. Didn't Mr. Callis do other work for you (the Standard Oil Company) during that period of two or three years other than removing tanks? As a matter of fact, didn't Mr. Callis put the lights in front of Mr. Raymond Jones?

"A. Yes, he put the bungalow sign up in front of Mr. Raymond Jones.

"Q. Under what sort of contract did he do that?

"A. For so much.

"Q. For so much money?

"A. So much money.

"Q. In other words, he bid on that contract and he agreed to do it and put it in place for a lump sum of money?

"A. Absolutely.

"Q. Is that the only job that you remember that he did under a special contract of that sort?

"A. Since he has done that, when we want a thing of that kind done, he does it for the same amount.

"Q. For the same amount of money?

"A. Yes.

"Q. And in each case it was a lump sum of money and he paid whom he chose to do it?

"A. Yes.

"Q. In this particular case I understood you to say you had an arrangement with Mr. Callis by which you were to pay him one dollar an hour?

"A. Yes.

"Q. The petition states you were to pay him $1.00 an hour for his work and for transportation, going to and from his work?

"A. Yes.

"Q. You paid him $1.00 an hour from the time he left his place?

"A. Yes; it included his transportation from his place to where he worked.

"Q. And he employed whom he chose to assist him?

"A. Yes.

"Q. But he could not pay his employee over fifty cents an hour?

"A. That we would not be responsible for anything in excess of fifty cents an hour.

"Q. Did you make any limitation as to what he should pay for truck hire?

"A. No; he should use his judgment about that.

"Q. If he paid for his truck hire more than you thought reasonable, you would not have paid it, would you?

"A. No. Of course, under the contract we had with him, we possibly would have had to pay it.

"Q. Who paid these bills to his employees?

"A. He paid them.

"Q. After the work was done, he would present you with a bill for his time, and for the work of Mr. A, B, or C, and the time that he made, and for the hire of the truck; is that the way the bill would be made?

"A. With the receipts attached, that he paid that amount of money.

"Q. And that was always done before you paid the bill?

"A. Yes. I never paid it at all.

"Q. The bill would be presented to you, and it would be O K'd and sent to the Standard Oil Company and paid by the Richmond office?

"A. Yes.

"Q. You say in this particular instance you simply called Mr. Callis over the phone and told him you would like to have two tanks removed from Richwine, one to Port Richmond and the other to Mr. Charlie Palmer's?

"A. Yes.

"Q. And he proceeded under that direction to carry out the contract?

"A. That is true.

"Q. There was no sort of contract made at that time?

"A. No. The contract had been previously made.

"Q. He was doing it in accordance with a previous arrangement made probably a year or two or three years ago?

"A. Yes.

"Q. Did you at any time direct, after notifying Mr. Callis to remove this tank—did you at any time tell him to change the position or place where you wanted it carried?

"A. No, sir; I did not.

"Q. Did you ever tell him you probably would not want it carried to Port Richmond?

"A. No, sir.

"Q. Do you know which tank he removed first—the one to Charlie Palmer's or the one to Port Richmond?

"A. I understand he took them both up at the same time. He was putting in one at Charlie Palmer's before he proceeded to Port Richmond.

"Q. As a matter of fact, your contract with Mr. Callis involved the moving of two empty tanks?

"A. Moving empty tanks and installing empty tanks.

"Q. You had no special agreement with him that he should take the gasoline out of the tanks did you?

"A. Yes. All tanks are to be drained.

"Q. By whom?

"A. By him or his helper.

"Q. Did the contract require him to do that?

"A. Yes, sir; absolutely, all tanks to be drained.

"Q. What became of the gasoline that he drained out of the tanks?

"A. I don't know. I have never seen him do it. He

told me Mr. Bennett used quite a bit of it in his car, but I don't know. That is what he told me, but I didn't see him.

"Q. Did the contract require Callis to plug the holes up in the tanks before he removed them?

"A. Yes, sir.

"Q. Why?

"A. To prevent the vapor that might be in the tank from rising.

"Q. Why did you want to prevent the vapor? I know, but I would like you to tell the jury?

"A. To prevent the vapor from escaping.

"Q. Why not let it escape?

"A. Of course, if you are not going to let it escape, just as I understand he let the one at Mr. Palmer's—he plugged it. If people, walking by that particular tank, would strike a match in the opening, of course the vapor would fire if you struck it right in the opening.

"Q. Mr. Fox, after this accident occurred, did you not go to see the Davis boy down here at their home?

"A. Yes, sir.

"Q. Didn't you attempt and request them to give you a written statement how the accident occurred?

"A. I asked them to give me a statement how it occurred.

"Q. In writing?

"A. I didn't care whether it was in writing or how. I didn't ask them to write it, but to give me a statement how it occurred.

"Q. Of course, you went there as agent of the company?

"A. I went there, yes, sir; and I also went to the hospital to inquire how he was. I drove up there Monday and back.

"Q. Did you go to see Mr. Clements? (Note, Clements was injured by same explosion that injured the plaintiff Davis.)

"A. I went to see Mr. Clements, and went to the hospital

to inquire about Robert Gray Davis. I went to both hospitals.

"Q. Didn't you offer to employ a nurse for Mr. Clements?

"A. Absolutely no, sir.

"Q. Did you not go to the Memorial Hospital, and, in a conversation with Mr. Hill Clements, the father of Mr. Leonard Clements, who was killed the same time this explosion took place, say to him, after inquiring about this boy—ask about a special nurse, and say you would like to give him a special nurse, as he was hurt by your company?

"A. Absolutely no, sir. I asked him up there—he told me he had some oysters coming up here that he wanted some gentleman (I have forgotten his name) to take care of and see that they were planted on his shore, and that would see him when he got back, and asked me to see that man. I did the following morning, but as far as any nurse or any assistant was concerned, no, sir—absolutely not.

"Q. You deny telling him that he was working for the company?

"A. Yes, sir; absolutely. He was not working for us."

Mr. Gay: "He is dealing with Mr. Clements, if your Honor please. This is Davis' case and not the Clements case. * * * I, therefore, renew my objection to the question."

Mr. Evans: "He has testified as to the character and nature of the contract, which we are trying to rebut. If this witness says that Mr. Clements, in the exercise of his duties, in the very moving of this very tank, which they claim Mr. Callis was moving as an independent contractor, if this witness says to Mr. Clements that your son was working for us, I submit that is evidence to go to this jury for them to decide whether or not he was working for Callis or whether he was working for him as an independent contractor, and it goes to the merits whether Mr. Callis was an independent contractor."

Witness: "I do not believe Mr. Clements will state that. I believe he is more truthful.

"Q.  I ask you whether or not Mr. Clements helped Mr. Callis to remove it?

"A.  Do I know?

"Q.  Yes.

"A.  No more than what I was told.  I didn't see him there.

"Q.  Did Mr. Callis tell you?

"A.  Yes.  I didn't see him working there.

"Q.  Any bill that was presented to you for payment, does Mr. Callis give you the names of the helpers?

"A.  He gives a receipt signed by the helper.

"Q.  It is a fact, I think, that will not be denied that the tank was taken up on a Tuesday evening; will you please state to the jury whether or not you directed, or any of the agents of the company, directed Mr. Callis, on Wednesday morning, to go to work on another job?

"A.  It may have been.  I did not.

"Q.  You don't know whether it was done, or not?

"A.  No.

"Q.  Mr. Fox, you stated that Mr. Callis has installed and removed for you in the past two or three years quite a number of tanks, estimated by you to be possibly 200. State how many of those tanks were new tanks and how many were used tanks, or have you any idea?

"A.  I couldn't tell you.

"Q.  Quite a number were new?

"A.  Some few were used possibly and maybe fifty to seventy-five, or maybe 100, he may have taken up himself. Maybe some of them were taken up from some other part of the State and used here.  I don't know just how many were used tanks.

"Q.  I understood you to say you didn't know how many were actually taken up out of the ground and moved?

"A.   No, I don't know actually how many, but I would say possibly 100 or seventy-five.

*Direct Examination of Roger A. Callis.*

"Q.   What is your occupation?

"A.   I run a store and do general work around—electrical work and tank work for Standard Oil Company sometimes and different work around and trying to make an honest living.

"Q.   And do some installation work for Standard Oil Company?

"A.   Yes, sir.

"Q.   Were you in the court room when Mr. Fox stated what arrangements he had made with you with respect to installing and removing tanks?

"A.   Yes; I think I was in here a part of the time.

"Q.   Did you hear his statement in respect to that matter?

"A.   Yes, sir.

"Q.   It is correct?

"A.   It is correct.

"Q.   How long have you been doing work of removing and installing tanks for Standard Oil Company?

"A.   I presume three or four years.

"Q.   Could you tell the jury, with any degree of satisfaction to yourself, approximately how many tanks you have removed?

"A.   I couldn't tell you, but I imagine 250 or 300—quite a few.

"Q.   With respect to the work of removing a tank from the ground, in pursuance of the contract which you have said existed, did you have any direction from the Standard Oil Company in the matter?

"A.   No, sir.

"Q.   Did you employ your own men?

"A.   Yes.

"Q. Did you pay them according to your own agreement with them?

"A. Yes, sir.

"Q. Subject to the limitation that they should not exceed fifty cents an hour?

"A. I never paid any over fifty cents an hour. I never got any instructions as to that. I never paid any more than that. I don't remember getting any instructions of that kind—I don't remember, but I never paid them over that.

"Q. If you had to haul a tank any distance, would you yourself employ a drayman?

"A. Yes, sir.

"Q. And pay him yourself?

"A. Yes, sir.

"Q. How did you get reimbursement from the Standard Oil Company?

"A. I would take the bill and have the fellow sign receipt, and I would send the bill in with my bill. Whoever hauled the tank would sign the paper.

"Q. You would submit your bill for the job, accompanied by the receipts for what expenses for labor and material you had paid?

"A. Yes, sir.

"Q. Do you recall who you employed, if anybody, to assist you in the work of removing the tank?

"A. Mr. Bennett helped me and Mr. Clements hauled it for me.

"Q. Did you employ Mr. Clements?

"A. I had to take these tanks and I think I had him with me all day.

"Q. You had Mr. Clements as a helper?

"A. Yes, sir; and I had the two pumps to haul to the Taylor Motor Company. I don't know whether he was with me all day.

"Q. What work did Mr. Clements do?

"A. He would help probably sometimes, but mostly just to haul.

"Q. Is he a person engaged in the general hauling business in the community?

"A. Yes, sir.

"Q. Did he have a truck of his own?

"A. Yes, sir.

"Q. Did you do this work in connection with removing the tank from Mr. Richwine's place under the same terms as had been your general custom?

"A. Yes, sir.

"Q. You expected to be paid in the same manner by the Standard Oil Company?

"A. Yes, sir.

"Q. You spoke of having certain plugs there to plug up the holes in the tanks when you removed them; explain to the jury briefly what that operation was?

"A. I would take the pipes out and screw plugs in there to prevent anything from getting in there, or dirt. In taking them out of the ground dirt from above falls in, and I put them in there to keep the dirt out, and also to keep the vapor from getting in there.

"Q. If you didn't have a plug convenient, did you have anything else you could use?

"A. Yes, sir; a wooden plug, but I didn't have that.

"Q. A wooden plug could have been put in there?

"A. Yes, sir.

"Q. In the several years you have been handling these tanks have you ever had any dangerous or injurious consequences to result from your work?

"A. No, sir."

*Cross-Examination of Roger A. Callis.*

"Q. I understand you have been moving tanks for some time?

"A. Yes, sir.

"Q. And it was your custom to plug them up and transport them?

"A. Yes, sir.

"Q. And the Standard Oil Company furnished you with those plugs?

"A. Yes, sir.

"Q. They did?

"A. Yes, sir.

"Q. I understood you to tell this jury the reason you didn't plug this particular tank up was you didn't have but one set of plugs?

"A. Yes, sir.

"Q. ·Then I understand the Standard Oil Company did not furnish you at that time with but one set of tanks?

"A. No, I am talking about plugs. When they sent the tank they always sent the plugs, but they didn't furnish you anything.

"Q. They didn't send you this tank?

"A. No.

"Q. Where did you get the plugs from?

"A. From older tanks. Say a tank would come to me and it would have plugs in it, I would take that plug and use it again, or if I was to go to remove one I would take it.

"Q. If you didn't get the plugs from the Standard Oil Company, you didn't have any way of getting them?

"A. Oh, yes, sir. I have bought them myself.

"Q. Where did you get them?

"A. From Southside and in Richmond.

"Q. You just told us you only got plugs from other tanks?

"A. No.

"Q. Didn't you state you got plugs from other tanks?

"A. Yes.

"Q. You stated the Standard Oil Company furnished

them, and then you changed it and said you got them from other tanks?

"A. Yes. They didn't furnish them.

"Q. Where did you get them?

"A. When they would send me a tank they would send plugs in it.

"Q. I don't catch what you mean by sending you a tank. They would not send you a tank?

"A. Yes; they would send them on the bus; they would send them sometimes to the place where it was to be installed.

"Q. In other words, if a tank was to be sent down to be installed, you would take the plugs?

"A. For instance, it was going down in the county; they would leave it at Cooke's corner, and the plugs would be· in it. I would get Mr. Clements, or whoever I wanted to haul it, to haul it, and I would take the plugs and if I was going to get another tank I would have the plugs, and if I didn't, I would have the plugs, and I have had to buy some.

"Q. When you bought those plugs, who paid for them?

"A. I paid for them.

"Q. And put it in the bill?

"A. Yes, sir.

"Q. As I understand you, you were called up over the telephone by Mr. Fox and told that they would like to have two tanks moved from Mr. Richwine's, one to be placed at Mr. Palmer's and the other to be carried to Port Richmond?

"A. Yes, sir.

"Q. Did you ever have any instructions from the company not to carry that tank to Port Richmond?

"A. No, sir.

"Q. On· Thursday or Friday of that week—the tank was removed by Mr. Clements on Tuesday, was it not?

"A. Yes, sir.

"Q. On Friday or Thursday didn't you have some

question that you didn't know whether you would carry the tank to Port Richmond?

"A. No; I don't recall that.

"Q. Mr. Callis, did Mr. Clements work for you in removing this tank? When you presented your bill for such work, did you pay the helpers beforehand or afterwards?

"A. Sometimes I would pay them before, but Mr. Clements nearly always owed me.

"Q. Sometimes you paid them afterwards, didn't you?

"A. Yes, sir.

"Q. Then, as a matter of fact, when you made off your bill for this work, you did make off a bill stating so many hours of your time and so many hours say of Mr. Bennett and so many hours for Mr. Clements and his truck?

"A. Yes, sir.

"Q. You presented the bill to Mr. Fox, and Mr. Fox would have the company send a check for the full amount?

"A. Yes, sir.

"Q. And then you would pay them?

"A. Sometimes, and sometimes I would give them the money right away if they wanted it.

"Q. Mr. Fox stated you always presented receipted bills before bills were paid. That is a mistake, isn't it?

"A. No, I didn't.

"Q. Yes, you did. What is the matter, Mr. Callis?

"A. Whether I pay him, or not, he signs a receipted bill.

"Q. The men sign a receipt before they are paid?

"A. Yes.

"Q. What sort of men do you have working for you?

"A. They trust me, I reckon, as an honest man. They always sign the paper.

"Q. But you made the other statement, and I couldn't understand why you should make it. Now, Mr. Callis, as a matter of fact, you employed Mr. Clements to take this tank over to Port Richmond, didn't you?

"A. Yes, sir.

"Q. You took it up and put it on his truck Tuesday afternoon?

"A. Yes, sir.

"Q. When did you expect to take that tank to Port Richmond and employ him to take it?

"A. Next morning.

"Q. Wednesday morning?

"A. Yes, sir.

"Q. Why didn't you do it?

"A. Wednesday morning I received a message from Mr. Thrift.

"Q. Who is Mr. Thrift?

"A. Standard Oil Company's driver and has charge of the stations.

"Q. He called you up over the phone?

"A. Yes; I think he did.

"Q. That is Wednesday morning?

"A. Yes, sir.

"Q. All right?

"A. He said Locust Grove farm couldn't get any gas and they wanted to plow and wanted to see if they couldn't get some gas.

"Q. On Wednesday morning you were notified by Mr. Thrift, the agent of the company, to go to Locust Grove to fix the tank. What did you do?

"A. I received the message, and Mr. Bennett was there ready to carry the tank to Port Richmond. I told Mr. Bennett to go and tell Mr. Clements we will not go today but will tomorrow—at least I told him to wait, that we had to go to Locust Grove to see if he couldn't get some gas so he could go to work with the tractor. It took us some time to fix it, and it was late and we didn't go. It was a long journey.

By Mr. Evans:

"Q. What did you do when you came back? What did you do the rest of that day?

"A. I went to the Taylor Motor Company. I thought probably I would put one of those in. We went there and worked the balance of the day.

"Q. At the Taylor Motor Company for the Standard Oil Company?

"A. Yes, sir.

"Q. Did you go yourself or send Mr. Bennett to Mr. Clements?

"A. I sent Mr. Bennett.

"Q. You didn't go to Mr. Clements' house?

"A. No, sir.

"Q. You notified Mr. Clements that you would not be able to go that day and to wait?

"A. To wait and we would go later. That night I received a phone message from Mr. Clements telling me that he was going to the Fair next day and would not be able to go.

"Q. That was Thursday?

"A. Yes, sir. Friday night I got another message saying that he would stay at the Fair and would not be back Friday, and told me to go ahead with the truck if I wanted to. I didn't know how to run a Ford, and I didn't like to leave the store on Saturday, and so we would go Monday.

"Q. Who paid you going down to Locust Grove?

"A. Standard Oil Company.

"Q. Who paid you for working on the tank that afternoon?

"A. The Standard Oil Company.

"Q. How did they pay you?

"A. The same way as always.

"Q. By the hour?

"A. By the hour, and sent the bills like all the rest of them.

"Q. Did you notify the Standard Oil Company that you would not carry the tank over to West Point until Monday morning?

"A. No, sir.

"Q. In your special—in your agreement with Mr. Fox to remove this particular tank, was there any time specified in which it was to be removed?

"A. No, sir.

"Q. No time was specified?

"A. No, sir.

"Q. Did you have any arrangement—you said you couldn't run a Ford truck. Didn't you have an arrangement with Mr. Clements that he was going to the Fair on Thursday and that your assistant, Mr. Bennett, would drive Mr. Clements' truck to West Point Friday?

"A. No, sir.

"Q. And that he would meet you coming from the Fair and put the tank in?

"A. No, sir.

"Q. You didn't have any such arrangement as that?

"A. No, sir.

"Q. Mr. Callis, during these two or three years, did you ever do any special contract work for the company?

"A. Yes, sir; I done some special contract work.

"Q. All right, tell the jury what it was.

"A. I put in electric lights in the plant for them, and put in some tanks—and some signs.

"Q. Did you put in the one at Mr. Jones'?

"A. Yes, sir.

"Q. You contracted to do that work at a lump sum?

"A. Yes, sir.

"Q. As a matter of fact, you bid on it, didn't you?

"A. Yes, sir.

"Q. And you made the lowest bid and got the job?

"A. I think so.

"Q. Did you have a written contract?

"A. No; I don't think we had a written contract, but I bid on it, I believe, and they sent me a slip telling me to go ahead and do it.

"Q. And the specifications?

"A. Yes, sir.

"Q. And you accepted that written statement?

"A. Yes, sir.

"Q. At a special amount?

"A. Yes, sir.

"Q. And you agreed to do it, didn't you?

"A. Yes, sir.

"Q. Did you sign the paper?

"A. No, sir; I didn't sign the paper. They asked me to bid on it.

"Q. Did you put the bid in writing?

"A. Yes, sir.

"Q. Then you did, in writing, agree to do that work for a certain price?

"A. Yes, sir.

"Q. You do not recall any other contract?

"A. No."

*Re-Direct Examination of Roger A. Callis.*

"Q. Mr. Callis, you have been asked on cross-examination about Mr. Clements' handling of this tank. I want to try to get that clear. These two tanks that you were removing were in Mr. Richwine's place, in Urbanna, as I understand it?

"A. Yes, sir.

"Q. And you had this contract to remove both of them and put one nearby on whose place?

"A. Mr. Palmer's.

"Q. The other you were to take to Port Richmond?

"A. Yes, sir.

"Q. You say, Mr. Callis, you employed Mr. Clements to do the hauling of the empty tanks?

"A.   Yes, sir.

"Q.   And did he haul the empty tank from Richwine's place in Urbanna?

"A.   Yes, sir.

"Q.   Who was on the truck with him, if anybody?

"A.   Myself and Mr. Bennett.

"Q.   Where did you go from Urbanna?

"A.   To my store at Stormont.

"Q.   Why did you stop at your store?

"A.   I was to put the tank out there.

"Q.   Why didn't you do that?

"A.   I told Mr. Clements to put it off, and I went in to take some tools, and when I come out I met Mr. Bennett and he asked me to let him carry it to his home and change it to another truck, that this truck wasn't good enough to carry it to Port Richmond next day.   I went into the store, and when I started out the store I met Mr. Bennett, and he said that he would change it to another truck.

"Q.   Then I understand he carried it to his place contrary to your instructions?

"A.   Yes, sir.

"Q.   What was your purpose in having it put off at your yard?

"A.   I was going to plug it and get all the gas out and shoot some water in it and fix it up for transportation.

"Q.   Did you have a storage yard on your place where you handle tanks?

"A.   Yes, sir."

### Re-Cross-Examination of Roger A. Callis.

"Q.   Mr. Callis, with reference to the statement that you have just made, do you mean to tell the jury you told Mr. Clements that he must not carry this tank to his house?

"A.   Yes, sir.   I didn't tell him not to carry it to his house, but to put it off here.

"Q.   Did you tell him that he could or must put it off here?

"A. To put if off here.

"Q. Where was the truck at the time you said that?

"A. Right at my door.

"Q. Right in front?

"A. On the side.

"Q. In the road?

"A. Yes, sir.

"Q. As a matter of fact, you just stated to this jury that you and Mr. Bennett rode with Mr. Clements on that truck to Stormont?

"A. Yes, sir.

"Q. Tell the jury where, at your place, you intended to throw it off?

"A. I was going to put it in the yard.

"Q. At the back yard?

"A. Yes, sir.

"Q. As a matter of fact, at the time you stopped the truck, hadn't you passed the lane going into your house?

"A. Yes, sir.

"Q. Why did you do that?

"A. I just dump them and roll them on.

"Q. Now, Mr. Callis, as I understand it, and the jury will probably know, when you drove from Urbanna you came up behind your store, didn't you?

"A. Yes, sir.

"Q. There is an opening or a gate which leads into a back yard of your store, isn't there?

"A. No; there is no fence there at all.

"Q. There is an opening?

"A. Yes.

"Q. You drove beyond that opening practically to the front of your store and stopped?

"A. I put them all out there.

"Q. You tell the jury you were going to take the tank and lay it on the side of the road by your store, or were you going to roll it into the lot?

"A.  I generally clean the gas out there and put it in the tank, and we have an old Ford we drive around.

"Q.  Did you think there was gas in it?

"A.  Yes.

"Q.  And you were going to turn it out?

"A.  Yes.

"Q.  Then, as a matter of fact, at the time you were removing the tank there were three pipes projecting from it?

"A.  Yes, sir.

"Q.  Were you going to take those off before you began to roll it?

"A.  Yes, sir.

"Q.  Will you tell me how, after it got on the ground and Mr. Clements had gone away with his truck, you were going to take the gas out?

"A.  Very often I take it with the truck, but this time I was going to put it up there.

"Q.  Can you put that 500 gallon tank up there?

"A.  Yes, sir.  We have a trestle made.

"Q.  A trestle made for the purpose of handling it?

"A.  Yes, sir.  I can put it up on the end any time.  We lift them right out of the hole.

"Q.  As a matter of fact, if you had ordered Clements to take the tank off at your place and not carry it further, he would have done it, wouldn't he?

"A.  He didn't.

"Q.  Didn't you say 'you can leave it here if you want?'

"A.  No.

"Q.  And didn't he reply that he was going to take it up there, that he wanted to change it or carry it to Richmond?

"A.  I said: 'Put the tank off here,' and he said that 'this truck is not able to go,' and I said 'put it off,' and I went into the store to get some tools; and when I came out they said he had gone.

"Q. Didn't you tell Mr. Ed Johnson, at Mr. Wood Davis' house on the Sunday following this accident, that you told Leonard Clements that he could put the tank off there if he wanted?

"A. No, sir.

"Q. But that he said that he wanted to carry it to his home, or because he wanted to go to the Fair?

"A. No, sir.

"Q. And you say you ordered Clements to put it off, and he said no, and then you let him do it?

"A. I didn't let him do it.

"Q. Whose job was it—yours or Standard Oil Company?

"A. Mine.

"Q. Then didn't you let him do it?

"A. No. If the man goes on up the road, I can't run up there and get him.

"Q. You knew that he was doing a dangerous thing?

"A. Yes, sir.

"Q. As I understand you to say, you went into the house to get some tools, and you came out and Mr. Bennett told you he had gone?

"A. Yes, sir.

"Q. How long a time intervened there?

"A. About two minutes.

"Q. After he had gone with the tank you didn't follow him?

"A. No.

"Q. You knew it was dangerous?

"A. Yes, sir.

"Q. You made no effort to protect the public or Mr. Clements against danger?

"A. I did all I could. I told him to put it off there.

"Q. You are the Roger Callis the defendant in the suit brought by Mr. Davis?

"A. Yes, sir.

"Q. Have you counsel?

"A. No, sir.

"Q. You knew where Mr. Clements was going to take the tank, didn't you?

"A. No.

"Q. He didn't tell you he was going to take it by home to change it?

"A. (Interposing) He said he was going to change it on his truck.

"Q. Didn't you know that he was going to carry it home?

"A. No.

"Q. Didn't you find out Wednesday morning?

"A. No.

"Q. Mr. Bennett didn't tell you the tank was in Mr. Clements' yard?

"A. No.

"Q. You say you didn't find out it was there until the explosion?"

Mr. Bazile: "He said that Mr. Bennett told him."

If the testimony of these two witnesses hereinabove set out be true, then Callis was an independent contractor, and not the agent of Standard Oil Company. To sustain a verdict finding that Callis was not an independent contractor it is necessary to disbelieve their testimony.

Considering the evidence introduced upon the trial of the special issue before the first jury, I find nothing therein which, in my judgment, could have warranted the jury in a finding that Fox and Callis were not telling the truth. There is nothing inherently improbable or unworthy of belief in their testimony. There is nothing in their testimony which is necessarily inconsistent with their positive testimony that Callis was an independent contractor. They do not contradict each other and there was no evidence introduced which contradicts either of them; and, so far as the record stood when the first jury rendered its verdict, they both stood

wholly unimpeached either upon a material or immaterial matter.

In this state of the record I think the court erred in not setting aside the verdict of the first jury upon the special issue, and in not then entering final judgment in favor of the Standard Oil Company, dismissing the action as to it.

While the court in its opinion does not in terms say so, the reasoning of the court in sustaining the verdict would indicate that in its opinion the verdict of neither the first, nor the second jury, can be sustained unless the jury was warranted by the evidence in disbelieving both Callis and Fox. In its reasoning in support of its conclusions the court says, among other things:

"The alleged agreement between Callis and the company was made two or three years before the accident occurred; Callis was directly interested in the result of the trial; Fox was an employee of the company; *both of them were contradicted on material matters affecting their credibility.*" * * *

"While, as stated, 'no witness' contradicted the statements of Callis as to the terms of the agreement, *it plainly appears that Callis did make contradictory statements directly affecting his credibility. As a witness he stated that he knew that gasoline was in the tank at the time of removal and that he intended to drain it out. In an affidavit made a few days after the explosion, and which was introduced by the company, Callis made the statement that the 'tank was well drained before it was put on the truck.' The affidavit was made for the purpose of relieving Callis of the imputation of negligence. It was in direct conflict with his evidence and was impeaching evidence of the highest order.* The jury was not bound to accept as true the statements of Fox and Callis."

None of the matter referred to in the italicized portions of the above paragraph appears from the evidence introduced before the first jury on the trial of the special issue. All of this italicized language refers to testimony introduced

upon the trial had before the second jury on the plea of the general issue.

Of course the court in its opinion is not to be understood as intimating that a court may reach over into the testimony introduced before the second jury to get evidence to support the verdict of the first jury, or reach back into the evidence introduced before the first jury to support the verdict of the second jury. It is not clear to me from the opinion of the court just how the court has viewed the proceedings had before the first jury upon the special issue; but in effect it would appear to have treated the case as if there had been no trial of the special issue before the first jury, and to have regarded the trial upon the general issue before the second jury as the only thing having any legal effect.

It is true that the evidence introduced before the first jury does show, to use the language of the court in its opinion, that: "The alleged agreement between Callis and the company was made two or three years before the accident occurred; Callis was directly interested in the result of the trial; Fox was an employee of the company. The company reimbursed Callis for money expended by him in removing gasoline tanks; that the company paid for any extra material bought by Callis; that during the period of the alleged agreement Callis did certain electrical work for the company under a separate written contract; that while engaged in removing the tank involved Callis was requested by one Thrift, an employee and agent of the company, to engage in other work for the company; (and) that Callis desisted in the removal of the tank and performed the work as requested by Thrift." But no one of these facts, nor all of them taken collectively, are sufficient to warrant a jury in finding that an unimpeached, uncontradicted witness is not telling the truth when he testifies to a contract between Callis and the Standard Oil Company under the terms of which Callis was an independent contractor.

But suppose for the sake of argument that I am wrong about the court having erred in not setting aside the verdict of the first jury and in not having then rendered judgment for the Standard Oil Company. Or suppose that, as the Standard Oil Company has introduced before the second jury on the trial of the general issue evidence tending to prove that Callis was an independent contractor that it has acquiesced in having the court treat the trial before the first jury as a mere nullity; and that there was *some* evidence introduced at the second trial which tended to support a verdict finding that Callis was an agent and not an independent contractor. If this be granted, I think the court erred in not setting aside the verdict of the second jury finding Callis, the agent, not guilty and the Standard Oil Company guilty, and in not awarding a new trial.

The most that I understand the court in its opinion to hold is that when the evidence introduced at the second trial is considered alone, or the evidence introduced both at the first and the second trials is poured into a common melting pot and considered together, as a whole, there is some evidence to support a verdict finding that Callis was the agent of the Standard Oil Company. I do not understand it to hold that if the jury had returned a verdict finding that Callis was an independent contractor the court would have been warranted in setting aside the verdict because without evidence to support it, or even that the decided preponderance of the evidence is that Callis was not an independent contractor. Certainly, I could not agree with it in either of these holdings.

In *Barnes* v. *Ashworth*, 154 Va. 218, 153 S. E. 711, 713, in the opinion of the court written by me, it is said:

"* * * the best considered cases, and we think the weight of authority, sustain the view that where a master and his servant are sued together for the same act of negligence and the master's liability, if any, rests *solely* upon the

servant's misfeasance or malfeasance, a verdict which in terms finds for the servant and against the master, or is silent as to the servant and finds against the master, is either predicated upon a misapprehension of the law, or is so capricious and arbitrary, or, at least, so contradictory and doubtful, that no judgment predicated upon the verdict should be entered for or against the plaintiff as to either the master or the servant, but upon the motion of either the plaintiff or the defendant master the court should set aside the whole verdict, the expressed or implied finding for the servant as well as the finding against the master. *Doremus* v. *Root*, 23 Wash. 710, 63 Pac. 574, 54 L. R. A. 649; *Emmons* v. *Southern Pac. Co.*, 97 Or. 263, 191 Pac. 333; *Begin* v. *Liederbach Bus Co.*, 167 Minn. 84, 208 N. W. 546; *Southern Ry. Co.* v. *Harbin*, 135 Ga. 122, 68 S. E. 1103, 30 L. R. A. (N. S.) 404, 21 Ann. Cas. 1011; *Pangburn* v. *Buick Motor Co.*, 211 N. Y. 228, 105 N. E. 423; *Hein* v. *Sulzberger & Sons*, 175 App. Div. 465, 163 N. Y. Supp. 995; *Childress, Adm'r*, v. *Lake Erie & W. R. Co.*, 182 Ind. 260, 105 N. E. 467; *Sparks* v. *A. C. L. R. Co.*, 104 S. C. 266, 88 S. E. 739; *Walker* v. *St. Louis-San Franscisco Ry. Co.*, 214 Ala. 492, 108 So. 388; *Hobbs* v. *Illinois Cent. R. Co.*, 171 Iowa 624, 152 N. W. 40, L. R. A. 1917E, 1023 and note.

"When such verdict is set aside, as a general rule, a new trial against both defendants should be awarded both upon the question of the amount of damages and the liability of the defendants. But in such a case when a demurrer to the evidence would have been sustainable as to the liability of the party who is alleged to have committed the act of negligence complained of, the court should enter final judgment for both defendants."

This rule of law is peculiarly applicable to the instant case; and, even if there had been no submission of the special issue in this case to the first jury, would require that the judgment of the court be reversed and the case remanded for a new trial.