## 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

SLEMP PUCKETT v. COMMONWEALTH.

September 17, 1931.

Present, Prentis, C. J., and Campbell, Holt, Hudgins and Gregory, JJ.

The opinion states the case.

*R. O. Crockett,* for the plaintiff in error.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the Commonwealth.

CAMPBELL, J., delivered the opinion of the court.

Plaintiff in error, Slemp Puckett, defendant in the court below, was indicted for the murder of Dave Wilson, and on

his trial by a jury was found guilty of murder in the second degree and his punishment fixed at six years in the penitentiary. A motion was made to set aside the verdict on the ground that "the verdict was contrary to the law and the evidence and not supported by the evidence," but this was overruled by the court and excepted to by the defendant.

The action of the court in refusing to set aside the verdict is assigned as error.

The accused admitted the killing of Wilson and upon his trial relied on the plea of self-defense.

The evidence, in chief, of the defendant appears in the record in narrative form as follows:

"The defendant, Slemp Puckett, stated that he was sixteen years of age at the time of the trial, and would be seventeen years of age in March, 1930; that he lived with his mother and father on Indian creek, in Tazewell county, Virginia; that prior to the night of the difficulty he had never seen deceased and knew nothing about him; that on Wednesday night, the night of the difficulty, deceased came to his father's house and 'hollered,' at a time when defendant, his younger brother and his father, James W. Puckett, were sitting before their fire; that defendant went to the door and asked deceased what he wanted, and he stated that he wanted somebody to show him the way across the river to Will Witt's home; that defendant slipped on his shoes, and without putting on his coat went out of the house to where the deceased was standing, and went in front of the deceased over the foot-log across Little river to the far side, at which point he told deceased how to follow the road and go by Ed. Gillespie's home to the house of Will Witt, the Will Witt home being about 300 yards south of the Ed. Gillespie home; that deceased then, instead of going in the direction pointed out, started in another direction; that the defendant called him back and again told him how to go, and then that deceased begged the defendant

to go along with him to show the deceased the way up the road to the Ed. Gillespie home; that there were no words of ill will spoken by either of them towards the other on the way to the Ed. Gillespie house; that when they got to the Ed. Gillespie house they went into the house and deceased, when he entered the room, kicked the chair, sat down in it, reached in his pocket for a mine lamp and began blowing the flame from the lamp into the room. This went on for some time, then the deceased began playing with a small child in the house, then asked for some buttermilk, which Mrs. Gillespie brought to him, and he then drank two glasses. Witness stated that he and deceased stayed at the Ed. Gillespie home for some time, probably two or three hours, during which there were no words of ill will spoken by the deceased to defendant or by defendant to deceased, and that the actions of the deceased were 'queer.' Defendant decided that he would have to go back home and deceased asked defendant to show him, deceased, the way up the road to the Will Witt home, which defendant declined to do, and told deceased that he, defendant, would have to go back home, that his parents would be uneasy about him, and then defendant invited deceased to go home with him and stay the rest of the night. Deceased at first said that he didn't think he had better go, that the father of the defendant might kick him out, and defendant replied that nobody had ever been kicked out of his father's house, before that time, and that all had been welcome; then deceased decided to go home with the defendant, and the deceased and the defendant left the Ed. Gillespie home together and started down the road towards the house of the father of the defendant. Witness further stated that he and the deceased were walking along side of each other down the road, deceased on the left of defendant; that there were no words of ill will spoken by the deceased toward him, and that so far as he knew, or had any right to know,

the relations between them were perfectly friendly until when they had gotten about 200 yards from the Ed. Gillespie home, the deceased, without any warning, jumped in front of the defendant and said: 'I am going to cut your * * * throat;' that even though it was dark the defendant could see the deceased at the time; that defendant backed off from deceased a step or two, the deceased following him; that defendant, as he backed off, stepped upon a stick, or what was in fact a dry fence rail, about five feet long, and the end of it not stepped on came up, was grasped by the defendant in his right hand, and he struck the deceased, holding fence rail in his right hand and striking from right to left; defendant further stated that he remembered striking the deceased once, but that he didn't know whether he had struck him more than one blow; that he couldn't remember it; that he was very much frightened by the deceased, and thought that it was necessary for him to strike in order to save himself; that he had no ill will whatsoever towards the deceased; that the difficulty was brought on by the deceased, and was not provoked in any way by the defendant; that after he, defendant, struck the blow he saw the deceased fall and he, defendant, then walked to his house; that he, defendant, did not approach the body of deceased after the blow was struck or after deceased fell; that the defendant did not see the deceased with any playing cards, and did not know how the playing cards got in the branch by the roadside or who put them there."

Other witnesses testifying in behalf of defendant stated that Wilson, who had been a hard drinker, had on Sunday prior to the homicide (which occurred on the night of November 6, 1929), been confined in jail on a charge of drunkenness, during which time he made threats against the "Puckett boys," charging them with having informed the officers of his drunken condition.

It also appears in evidence that when Wilson could not

obtain liquor to drink he resorted to the use of turpentine to quench his thirst, and when under the influence of stimulants appeared "mentally unbalanced."

The case made by the Commonwealth against the defendant may be thus stated: Wilson was a boarder in the home of Mrs. Alta Lester; on the day of the homicide Wilson arrived at the home of Mrs. Lester in the morning and stayed there until 4 P. M.; he was in an intoxicated condition; he had in his possession a deck of marked cards, seven dollars in silver, some paper money and some "small change."

Hubert Peery, a witness, testified that on the morning following the killing the defendant stated to him that when Wilson threatened to cut defendant's throat that he, defendant, picked up the piece of fence rail and struck Wilson one blow; that he had no intention of killing him but was merely trying to get away from him.

L. F. Harman, sheriff of the county, testified that on the morning following the homicide defendant pointed out to him and S. F. Lewis, his deputy, the place where the fence rail had been lying; that they examined the ground and found no "sign" of the rail having lain at the place indicated; that there was no brown grass at the point indicated by defendant, nor any evidence whatever of a "groove" in the soil. Harman further stated that in making an examination of the locality where Wilson was killed, that at a point approximately 150 yards from where the body of Wilson lay and in the direction of the home of the defendant, he found a playing card on the bank of a creek, and upon further examination found in the creek, scattered for a distance of 200 feet, forty-nine playing cards. These cards were introduced in evidence and identified by Mrs. Lester as similar to the cards she had seen in the possession of Wilson.

Lewis, the deputy sheriff, stated that he visited the scene

of the homicide the morning following; that he searched the clothing of the deceased; that he found a closed pocket knife in the right hand pocket of the trousers, under a suit of overalls; that in the watch pocket of the trousers, which was pinned together, he found a small bag with some "small change" in it; that he did not find any bills or other currency. Lewis also stated that defendant said he only struck the deceased one blow with the piece of fence rail.

An examination of the body of Wilson by the mortician disclosed the following wounds and abrasions: "On the right side of the head the right cheek was crushed and broken—over right eye a deep wound about an inch cut through eye brow—right ear cut practically through entire ear; left side of head, the left ear bruised, a small cut over ear and bruise about three-fourths of an inch wide, one and one-half inches long. About half way between base and top of skull cut more than two inches long, going back about three-fourths inch under scalp. About base of head a small wound. Left little finger cut and skull crushed."

The contention of the defendant that the verdict is contrary to law is untenable. The record does not embody any instructions, nor does it disclose any error committed by the trial court in the admission of evidence. If any instructions denoting the law of the case were given on the trial, it must be assumed that they correctly stated the law.

In Virginia, murder is either murder in the first degree or murder in the second degree. Every unlawful homicide is, with us, murder in the second degree and the burden is on the Commonwealth to elevate the offense to murder in the first degree. If the accused seeks to reduce the offense to manslaughter, the burden is upon him.

In our opinion, in the case at bar, the question of whether the accused is guilty of manslaughter is not involved. According to his statement he was violently threatened by a man crazed with liquor and turpentine, and in

order to preserve his life or in reasonable apprehension of bodily harm, he struck the deceased one blow with a piece of fence rail which he accidentally stepped upon and grasped in his hand at a fortunate moment. The killing, if committed under such circumstances, is clearly a case of justifiable homicide in self-defense.

It is argued that the jury should have accepted the statement of the defendant as true and returned a verdict of not guilty.

*Buck* v. *Commonwealth,* 116 Va. 1031, 83 S. E. 390, 393, is relied upon. There it is said: "Though the case has to be considered as upon a demurrer to the evidence by plaintiff in error, he is not required to waive his own evidence as to which there is no conflict or contradiction, and such evidence is to be accepted as true."

That case is not in point, as the facts are dissimilar. There, no conflict in the evidence appeared nor was there any contradiction of the statement of the accused. In the case at bar glaring contradictions occur. The accused stated to two unimpeached witnesses that he only struck the deceased one blow and that to prevent having his throat cut. The examination of the body of the deceased demonstrated that he had been cruelly battered until life became extinct. The accused further stated that the piece of fence rail, five feet in length, came into his hand by accident. In this he was contradicted by the witness Peery who testified that accused informed him that the club was "picked up." He is also contradicted by Harman and Lewis as to the location of the club on the ground. Only on his cross-examination, when confronted with the mangled condition of the deceased, did he modify his statement as to the one blow having been struck, by stating that he might have delivered more than the one blow. When confronted with the inference that the deceased had been robbed he gave no satisfactory explanation of the scattered

playing cards found at a distance of 150 yards from the scene of the killing, though he was present with the deceased every step of the fateful journey.

The established fact that the deceased had money when he left the home of Mrs. Lester and that no money was found upon his person after the homicide is a pregnant circumstance.

The jury, whose province it is to pass upon the facts, had the unquestioned right, in the light of the evidence showing that defendant had been contradicted by both parol and circumstantial evidence, to refuse to credit his statement that he killed the deceased in self-defense.

In *Chesapeake and Ohio Ry. Co.* v. *Martin and Porter*, 283 U. S. 209, 51 S. Ct. 453, 456, 75 L. Ed. 983, the court quotes with approval the general rule laid down in *Hull* v. *Littauer*, 162 N. Y. 569, 57 N. E. 102: "Generally, the credibility of a witness, who is a party to the action and, therefore, interested in its result, is for the jury; but this rule, being founded in reason, is not an absolute and inflexible one. If the evidence is possible of contradiction in the circumstances, if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it."

In *Clopton's Case*, 109 Va. 813, 818, 63 S. E. 1022, 1023, Judge Keith quotes with approval from Proffatt on Jury Trial, section 363. There we read:

"The general rule, that where unimpeached witnesses testify positively to a fact, and are uncontradicted, the jury are not at liberty to discredit their testimony, is subject to exceptions; as, where the statements of the witness are grossly improbable, or he has an interest in the question at issue. However well settled the rule may be that the credibility of a witness is for the jury, the judge has power

to instruct them as to what circumstances are to be unfavorably considered in their estimation of his evidence. So the testimony of a witness may be wholly rejected by a jury, if from his manner and the improbability of his story or his self-contradiction in the several parts of his narrative, the jury become convinced that he is not speaking the truth; and this is true although he be not attacked in his reputation, or contradicted by other witnesses."

That the above is the accepted rule in Virginia is reaffirmed in *Metropolitan Life Ins. Co.* v. *Botte*, 153 Va. 468, 480, 143 S. E. 625, 154 S. E. 603.

The final question is, does the evidence adduced by the Commonwealth warrant the verdict of the jury? In our opinion it does.

In *Mercer* v. *Commonwealth*, 150 Va. 588, 594, 142 S. E. 369, it is held that when the Commonwealth has proved the commission of a homicide and has pointed out the accused as the criminal agent, then it may rest its case, and unless the accused shows circumstances of justification, excuse or palliation, a verdict of murder in the second degree will be warranted.

That the accused was only found guilty of murder in the second degree and his confinement in the penitentiary fixed at six years may be accounted for by reason of his extreme youth.

We find no error in the action of the trial court and the judgment is affirmed.

*Affirmed.*