# Richmond

GEORGE H. POOLE v. MATTIE L. KELLEY, ADMINISTRATRIX OF SAMUEL L. KELLEY, DECEASED.

March 22, 1934.

Present, Campbell, C. J., and Holt, Hudgins, Browning and Chinn, JJ.

280

The opinion states the case.

*Allan Epes,* for the plaintiff in error.

*H. H. Watson, W. Moncure Gravatt* and *J. Segar Gravatt,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

On the afternoon of March 16, 1932, Samuel L. Kelley, plaintiff's intestate, was killed in an automobile accident. His administratrix has recovered against the driver of the car in which he rode a verdict and judgment of $7,500.

George H. Poole took Kelley, a possible purchaser, to look at a house in the town of Crewe which Poole had for sale and in which he was interested.

The motion for judgment charges that after this inspection Poole with Kelley as his guest, drove out towards Burkeville. The car in which they rode was a comparatively new one, a Hudson eight cylinder sedan in good mechanical condition. Kelley on the front seat sat by the

defendant, George H. Poole, and on the rear seat sat Poole's brother, Harry. The road itself is paved with sand, gravel and tar and was in good condition. Its paved surface was seventeen and one-half feet wide with a dirt shoulder of about six feet on each side. These shoulders were graded up to the paved surface, sloped gently away and were in good condition. The day was clear and the road was dry.

On the north side of the road, and at the end of the corporate limits of Crewe, Dade street intersects the highway. At that corner is Jennings' filling station and it was there that the Poole car passed a car in which were Miss Minnie Stone and Miss Dorothy Lush. The Poole car next passed a car driven by W. P. Bostick. All cars were west-bound. The Bostick car was overtaken at a culvert 1,271 feet west from Jennings' filling station. The road going west is down-grade to this culvert and up-grade beyond it, but the grades are not heavy and the road is straight. After passing the Bostick car the Poole car traveled west 163 feet when it left the road and ran along against and on the top of a southside cut somewhere between four and five feet high. It ran along this bank for about 200 feet. It then crossed the road to the north side, turned over, and finally came to rest facing east. Kelley was thrown through the top and died in a short time from injuries then suffered.

For the plaintiff it is said that the accident was due to reckless driving and to excessive speed. The defendant contends that the speed was not excessive and that the accident was due not to speed at all but to some mechanical defect in the car.

██ We have a verdict, confirmed by the judge who saw the witnesses and heard the evidence. It must be sustained if there is substantial evidence to support it. All presumptions are in its favor.

Mrs. Richcreek saw this car when it was about two blocks east of Jennings' filling station. She said that it was "traveling west on the highway at a terrific speed;"

that it sounded "like an airplane;" that it made a terrific noise" and in her judgment was traveling somewhere between sixty and seventy miles an hour.

Miss Minnie Stone said that she and her friend, Miss Lush, were driving between thirty and thirty-five miles an hour when the Poole car passed, "going mighty fast," so fast that it made a distinct impression upon her as being something out of the ordinary. She said that she and her friend had gotten to Mr. Leath's house when Poole passed the Bostick car. Leath's house is 490 feet from the filling station, while, as we have seen, the culvert was 1,271 feet from it. That is to say, Poole drove 1,271 feet while the Stone car was going 490 feet, and the Stone car was going, according to the estimate of this witness, somewhere between thirty and thirty-five miles an hour. On this basis it would appear that the Poole car was traveling from seventy to ninety miles an hour. Miss Dorothy Lush drove the car which Poole passed at the filling station. Her estimate of her speed is thirty-five miles an hour. She said she could not say how fast the Poole car was going but that it was "traveling awfully fast." Her testimony as to where she was when the Poole car passed the Bostick car and where the Bostick car then was agrees with the statement of her friend, Miss Stone. She is positive that the Poole car passed the Bostick car in the bottom where the culvert was.

Mrs. Bostick would not undertake to say what the speed of the Poole car was. She did say that "it was going very fast" and that "it nearly frightened me to death."

Mr. Bostick said that the Poole car passed him at a telephone pole thirteen feet east of the culvert and came so near striking his car that his wife screamed. He also declined to commit himself definitely as to speed. He said that Poole was running fast, certainly as much as fifty miles an hour and that "the car was evidently out from under control when he got up to me." It gave no signal of a purpose to pass.

A. H. Klocke sold this car to Poole and saw it almost

every day before the wreck. It was in "A No. 1 condition" and would run ninety miles an hour. After the wreck it was brought back to his shop. He saw nothing to indicate that the accelerator had ever been stuck or that the spring which operated it was not in perfect condition.

Harry Poole, a brother of the defendant, sat on the back seat. He could not tell how fast he was going but said that in attempting to pass the Bostick car their car got out of control. He dropped to the floor, caught hold of the foot rest, said to his brother, "You let the car get away," and held on until he was knocked senseless.

The defendant testified in his own behalf. He said that he was traveling about the rate of forty miles an hour and that when within twenty or thirty feet of Bostick he stepped on the accelerator, intending to pass him when "this car shot away from me like a bullet," and on this statement is built up the theory of the defendant, which is, that for some unexplained reason the accelerator became jammed and control of the car was lost. This excerpt is from the defendant's testimony:

"A. We were going on up there. I saw two cars, well, I reckon, about 600 or 800 feet ahead of me, maybe a little further than that. One was ahead about a block of that. I followed those cars. When we got near the end of the concrete, or directly after we got off the concrete, I passed one car. I was not driving more than forty miles an hour. I passed Mr. Bostick in the bottom. I stepped on the gas and this car shot away from me like a bullet. It began to shimmy. The car got away from me and there was nothing I could do to control it.

"Q. You lost control of the car?

"A. Yes, sir.

"Q. What was the cause of your losing control of the car?

"A. Well, I feel something was bound to have happened to the accelerator to cause the car to shoot away like it did. I had been driving the car about ten months

and had never had anything to happen to it, in no way, shape or fashion.

"Q. The road was wide enough?

"A. Yes, sir.

"Q. How fast were you running when you reached Mr. Bostick's car?

"A. I had been running around forty miles an hour before I got up to him. These cars were ahead of me. I could not have run very fast before I got to them.

"Q. What did you do?

"A. I put the brake on. I thought I had my foot on the brake. The car had got so fast I could not do anything and I reached to cut the switch off and when I did it run into the bank and when I was thrown forward my weight bent the key and I could not do anything with it."

It will be noted that this witness tells us that he lost control of the car but gives no definite explanation of how this came about. He says that he feels that something must have happened to the accelerator and that this happened before he reached the Bostick car. No definite statement of a fact is made and the reason assigned is but in the nature of a suggestion or theory. He does tell us that the passing was "in the bottom." Elsewhere he explains his desire to pass in a hurry. He said that there was a hill ahead of him and that he wanted to complete the passing before the crest of the hill was reached. That crest was 500 feet from the point of passing. He said that Kelley made no protest as to speed. In this he is contradicted by other witnesses, among them Mrs. Neblett, who is a daughter of Mr. Kelley. She said that Poole stated to her mother "The last thing I remember Sam saying was, 'For God's sake, George, don't let this car get away from you,' and I asked him, 'Mr. Poole, you must have been driving awfully fast for Papa to have said that,' and he said, 'Well, I don't know how fast I was driving.'"

In the course of Miss Stone's cross-examination, this appears:

"Q. Where was the first point on the road you saw the car you thought was Mr. Bostick's car?

"A. At Mr. Leath's house.

"Q. How far behind Mr. Bostick were you?

"A. I don't know how far.

"Q. You know about the distance of an ordinary block in a town?

"A. I suppose it was about a block.

"Q. You were about a block behind Mr. Bostick?

"A. I suppose so; I could not say for sure."

This also is an excerpt from Miss Lush's cross-examination:

"Q. Miss Lush, did you see Mr. Bostick's car in front of you when you were on your way from Crewe to Burkeville that day?

"A. Yes, I saw it.

"Q. About how far in front of you was that car?

"A. I could not tell how far; I could see it.

"Q. About a quarter of a mile?

"A. I am not sure of miles; I could not tell you.

"Q. You know about town blocks?

"A. It might have been that.

"Q. Might have been about a town block in front of you?

"A. Yes, sir."

From this it is argued that if the Bostick car was traveling at about thirty-five miles an hour and was only 400 feet ahead of the Lush car, then the estimates of speed and distances theretofore given by these young ladies must be erroneous.

██ All of the witnesses, including Poole himself, say that the passing was in the bottom. We have the definite statement that at the moment of passing the Lush car was at the Leath house and that the Poole car passed them at the filling station. Estimates of distances are of course less reliable than ascertained distances between fixed monuments, and even if it were to be conceded that there was a conflict here that was for the jury.

It is further said that if the Lush car was traveling about thirty-five miles an hour it would have reached the point of accident sooner than the evidence shows that it did reach it, and therefore that they must have been mistaken as to this rate. We do not know that they continued to travel as fast as they were going when Poole passed them. His car, after passing Bostick's threw up so much dust that Bostick stopped to wait for it to settle. Mr. Leath, an eye witness, because of this dust could not at one time see the Poole car, and it is highly probable that the speed of the Lush car in such circumstances was cut down. Whether it was or not we are unable to say definitely from the evidence, but it is not likely that Miss Lush, seeing what appeared to be an accident ahead, would have run into a dust cloud without checking speed. All of this was for the jury.

Looking at the evidence from the plaintiff's standpoint, it shows, or tends to show, that before Poole reached the filling station he was driving so fast that Mrs. Richcreek, who was a block or more away first thought that some airplane must be passing. All of the witnesses concur in saying that Poole was traveling rapidly though they vary in their estimates. If we accept as fixed monuments located by witnesses, he must have approached the Bostick car at a rate of eighty or ninety miles an hour. He attempted to turn out and pass when within about thirty feet of it when his car shot forward like a bullet. He then lost control and it is reasonable to assume that he lost control because he attempted to turn too sharply traveling at excessive speed. This conclusion is impressively supported by the conduct of Poole's brother who dropped to the floor and caught hold of the foot rest.

When a car undertakes to pass a car ahead going in the same direction, it must signal its purpose, that the car ahead may give place to the oncoming vehicle. Code, sections 2145 (13), 2145 (14). This was not done.

We do not undertake to say that any certain speed is gross negligence where the road is wide and straight.

██ "What may be deemed ordinary care in one case may, under different surroundings and circumstances, be gross negligence. The policy of the law has relegated the determination of such questions to the jury, under proper instructions from the court. It is their province to note the special circumstances and surroundings of each particular case, and then say whether the conduct of the parties in that case was such as would be expected of reasonable, prudent men, under a similar state of affairs. When a given state of facts is such that reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusion from them, that the question of negligence is ever considered as one of law for the court." *Grand Trunk Railway Co.* v. *Ives*, 144 U. S. 408, 12 S. Ct. 679, 683, 36 L. Ed. 485; *Boggs* v. *Plybon*, 157 Va. 30, 160 S. E. 77.

There was ample evidence to warrant the submission of this question to the jury. It was submitted under proper instructions and decided adversely to the defendant.

██ Gross negligence consists not so much in speed, as an abstract proposition, but in Poole's attempt, when within thirty feet of Bostick's car, to pass it, as he did. He cut to the left and must have cut sharply to the left, and stepped upon the accelerator. He then, as might have been expected, lost control.

██ When Poole was being examined he was asked by his counsel if Kelley protested the speed of the car. An objection was interposed and sustained. This question was not then answered. After both sides had rested but before instructions were given, counsel, in order to perfect an objection to the exclusion of this testimony, in the absence of the jury, undertook to elicit from Poole what his answer would have been had he been permitted to make it. Counsel for plaintiff then withdrew his objection to this evidence. Counsel for the defendant, then

in turn, was unwilling for the witness to answer in the presence of the jury. The court itself, then in the presence of the jury, asked the defendant if Kelley did in fact object to the way in which he drove. Poole answered that he did not and was cross-examined as to this answer. It would have been unfair to the court to permit counsel for Poole to perfect an exception which counsel for Mrs. Kelley was willing to waive.

Poole was then cross-examined as to this matter and with necessary specifications was asked if he had not elsewhere made a conflicting statement. He said that he had not. Plaintiff was then permitted to introduce another witness whose testimony tended to show that Poole had theretofore admitted that Kelley did in fact protest. In all of this the court exercised sound and wise discretion. This testimony was competent both because it contradicted the defendant and because it was an admission against interest.

"If the objection is that the evidence was improper in rebuttal, the answer is that the time and manner of the introduction of evidence lies within the sound discretion of the trial court, and in the absence of abuse of this discretion resulting in prejudice to defendant's case, this court will not reverse the judgment of the trial court." *Virginian Railway* v. *London,* 148 Va. 699, 139 S. E. 328, 333; *Ashby* v. *Virginia R., etc., Co.,* 138 Va. 310, 122 S. E. 104; *Grand Trunk Ry. Co.* v. *Richardson,* 91 U. S. 454, 23 L. Ed. 356.

Sundry exceptions are taken to the action of the court on instructions. Plaintiff's instruction No. 1 reads:

"The court instructs the jury that the defendant owed deceased S. L. Kelley the duty not to either knowingly or wantonly add to the perils to be ordinarily expected upon such a trip, and that if the defendant either knowingly or wantonly did add to such perils, and as the proximate result deceased was killed, then you should find for the plaintiff."

It is said that this instruction should have told the jury

that they must believe that reckless driving was the sole proximate cause of the accident and not the proximate cause of the accident. Accurately speaking there may be more than one proximate cause. *Etheridge* v. *Norfolk Southern R. Co.*, 143 Va. 789, 129 S. E. 680. And so it is argued that both speed and some mechanical defect may have been proximate causes both of·which contributed tó the wreck.

In plaintiff's instruction No. 2 the jury was told that they must believe that reckless speed was the sole proximate cause of the accident.

In the defendant's instruction numbered four, the same inaccurate use of the word "proximate" appears. It is there said:

"The court further instructs the jury that the burden is on the plaintiff to prove by a preponderance of the evidence that some cause for which the defendant is liable was the proximate cause of the injury."

But the jury could not possibly have been misled; for this matter is made clear by defendant's instruction No. 5, which reads:

"The court further instructs the jury that if it appears from the evidence that it is just as likely that the injury and death of the plaintiff's intestate was caused by some defect in, or the getting out of order of, the steering gear, accelerator or some other part of the car as from the reckless and wanton operation of the car by the defendant, then they must find for the defendant. The law required a plaintiff to show by a preponderance of the evidence that the injury complained of was caused by some cause for which the defendant was liable, and if it appears from the evidence that it was as probable that the injury was caused by some cause for which the defendant was not liable, then the plaintiff cannot recover."

It is also said that plaintiff's instruction No. 1 should have told the jury that they must believe that the accident was not due to some mechanical defect. As we have seen, the court did, in another instruction, make this

clear. The plaintiff was not required to set out defendant's theories in her instructions.

Defendant objected to plaintiff's instruction No. 2 because it is said that there is no evidence of gross negligence and no evidence to show whether the accident was due to speed or to some defect in the accelerator. We have already stated the evidence and it is not necessary to restate it. The court did, as we have seen, tell the jury that they should find for the defendant if they thought it "just as likely that the injury and death of plaintiff's intestate was caused by some defect in, or the getting out of order of, the steering gear, accelerator or some other part of the car," which is all and more than the defendant had the right to expect. As we have seen there is really no evidence which shows that there was anything the matter with the car. It was all right before the accident and it was all right after the accident, so far as the accelerator was concerned. All the plaintiff said was, "Well, I feel something was bound to have happened to the accelerator to cause the car to shoot away like it did." He nowhere said that anything did happen to it. He was following a car at a rapid rate, stepped on the accelerator and the car shot forward. So far from showing that the accelerator was out of order it shows that it was in order.

Plaintiff's instruction numbered eight is challenged. It reads:

"The court instructs the jury that any person driving a vehicle on a highway shall drive the same at a careful and prudent speed, not greater nor less than is reasonable and proper, having due regard to the traffic, surface, and width of the highway, and of any other conditions then existing; and any person who shall drive any vehicle upon a highway at such speed as to endanger the life, limb or property of any person, or when not under complete control, or exceeding a reasonable speed under the circumstances and traffic conditions obtaining at the time is guilty of reckless driving."

This instruction is taken from Code, section 2145 (3),

and was intended to apply to cases of ordinary negligence. Certainly a failure to have a car under complete control is not always gross or wanton negligence. It follows that this statement of the law is inapplicable to the facts in judgment. They are controlled by the principles enunciated in *Boggs* v. *Plybon, supra; Jones* v. *Massie,* 158 Va. 121, 163 S. E. 63; *Young* v. *Dyer,* 161 Va. 434, 170 S. E. 737. And it was on these principles that the case was actually tried as is manifest from instructions given. All of which, of course, highly favored the defendant.

It is but an accurate statement of an inapplicable rule of law. There was no direction to find and there was no question as to grades of negligence. If the defendant was guilty at all his offense was gross.

In *Windsor* v. *Carlton,* 136 Va. 652, 118 S. E. 222, 223, Kelly, P., said: "The doctrine of harmless error is favored by this court, and is applied whenever it seems reasonable and safe to do so." This proposition has been many times and in various ways affirmed by us. *Oliver* v. *Commonwealth,* 151 Va. 533, 145 S. E. 307.

Defendant's instruction A was refused. It dealt with the doctrine of sudden emergency not occasioned by a defendant's fault. The court had already told the jury in instruction five that they should find for the defendant if they thought that the accident was due to any unknown defect in the car, which, as we have seen, not only covered the points in issue, but favored the defendant beyond the limits of his evidence.

Instruction B was also refused. It reads:

"The court further instructs the jury that they should disregard all evidence in this case as to the failure of the defendant to signal the Bostick car that he was about to pass it. No injury was done the Bostick car or any of the occupants thereof and such signal was intended to be only for the benefit of the occupants of the car about to be passed, and the giving or failing to give the same has no bearing on the issues in this action."

It was properly rejected. Evidence of this kind tends

to show the manner in which Poole was operating his car. The statute, as we have seen, requires the car ahead, upon signal, to slow down that the car following may pass in safety.

■ Other instructions tendered on behalf of the defendant were rejected and properly rejected. They dealt with matters already covered. Repetition was neither necessary nor desirable.

■ The record shows that the jury was fairly instructed, that the parties have had a fair trial upon the merits of the case and that substantial justice has been done. That is enough. As Kelly, P., said in *Virginia Ry. & P. Co.* v. *Smith & Hicks,* 129 Va. 269, 105 S. E. 532: "It is our purpose to vitalize this provision [Code, section 6331] in its application and administration"—a purpose approved by Prentis, P., in *Virginia Ry. & P. Co.* v. *Taylor,* 144 Va. 496, 132 S. E. 334, 337.

■ It was urged in argument that Kelley was not a guest, or at least not a guest who came within the doctrine of *Boggs* v. *Plybon,* but that Poole was attempting to please a possible purchaser of property in which he was interested. This case was tried upon the theory that this doctrine did apply, and since we have reached the conclusion that under it a recovery must be sustained, it is not necessary to determine the plaintiff's rights under a less stringent standard. In other circumstances this might be an important question.

■ Whenever transportation is for the pecuniary benefit of the defendant, this fact, when established, takes the case out of the category of gratuitous transactions. *Foley* v. *McDonald* (Mass.) 185 N. E. 926.

We find no reversible error in the judgment appealed from and it is. affirmed.

*Affirmed.*