# Staunton

EDITH MAXWELL *v.* COMMONWEALTH OF VIRGINIA.

September 11, 1936.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Browning and Eggleston, JJ.

The opinion states the case.

*M. J. Fulton, Charles H. Smith, Gail Laughlin, W. W. G. Dotson, R. P. Bruce* and *A. A. Skeen,* for the plaintiff in error.

*Abram P. Staples, Attorney-General, Edwin H. Gibson, Assistant Attorney-General,* and *Joseph L. Kelly, Jr., Special Assistant,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

Petitioner, Edith Maxwell, and Ann Maxwell were jointly indicted in the Circuit Court of Wise county for the murder

of Trigg Maxwell, the father of Edith and the husband of Ann Maxwell. Edith Maxwell was separately tried, convicted of murder in the first degree, and sentenced to confinement in the State penitentiary for twenty-five years.

The principal assignment of error is that the evidence is not sufficient to support the verdict.

Taken in the light of the verdict, the record discloses these facts: Petitioner is a young woman twenty-one years of age, still living with her parents in Wise county where she was born and reared. Largely through her own efforts she had finished high school and obtained two years of college education fitting herself as a teacher. She had taught for one year in the public schools of her native county and was preparing to continue such work.

Trigg Maxwell, petitioner's father, was some fifty odd years old and a coal miner by occupation. When sober he was kind and good to his family, but unfortunately he was addicted to drink and when under the influence of liquor was quarrelsome, abusive to his wife and children, and inclined to otherwise treat them unreasonably. Whether he was drunk at the time of his death is the subject of much conflict in the evidence. The accused and her witnesses claim that he was, while the Commonwealth's witnesses contend that he was not. The jury's verdict, of course, settled this conflict adversely to the accused. But even so, the Commonwealth's evidence shows that he had been drinking shortly preceding the occurences leading to his death.

On Saturday afternoon, July 20, 1935, Trigg Maxwell left home and did not return until about 10:30 P. M. Only his wife, Ann Maxwell, and his twelve year old daughter, Mary Katherine, were then there and both had retired. He turned on the light and immediately began quarreling with his wife as to where she had been picking berries that day and where she intended going the next. Something was said by him about giving her "thirty minutes to leave the house" the next morning. Thinking that he was drunk, the wife remonstrated with him and urged him to go to bed, but he declined to do so

and went out of the house. Mrs. Maxwell and Mary Katherine then went to sleep.

About 12:30 A. M. the husband returned home. Upon finding that Edith had not then returned he became irritated, remarking that "A man ought to take a club and break her neck." His wife again remonstrated with him, accused him of being drunk and again tried to induce him to retire, which he refused to do.

According to the next door neighbors, who testified for the Commonwealth, shortly before 1:00 o'clock that night a car drove up, some one got out and went into the Maxwell home. Almost immediately an altercation began and continued for about ten minutes. Loud voices of the father, mother and Edith were heard. The parties appeared to be "scuffling." In a short while the voice of Trigg Maxwell was heard repeatedly crying in distress, "Oh Lordy, Oh Lordy!" Edith, partly clad, was seen to run out of the house and heard to call to her younger sister, Mary Katherine, to bring her shoes and clothes.

Chant Kelly, the head of the family living next door and still awake, went over to the Maxwell home to render aid. He was met by the accused, who refused his proffered assistance. Kelly then returned to his own house. Immediately the radio began playing in the Maxwell house with sufficient volume to drown out any other noises therein. This continued for about ten minutes, then there was quiet.

After a period of about thirty minutes Mary Katherine Maxwell ran to the Kelly residence calling for help, saying that her father was dying. Upon the arrival of the neighbors and a physician, Trigg Maxwell was found lying in the doorway leading from the kitchen to the porch, with his head about thirty inches from a meat block. He was clad only in his underclothing, was unconscious and died within fifteen minutes.

In explanation the accused, her mother and younger sister, Mary Katherine, said that the deceased had been drunk and had fallen and struck his head against the meat block, sustaining the injuries of which he died. Not until after the

arrest, a day or so later, of the accused and her mother, upon the charge of having murdered the deceased, was anything said by either of them, or by Mary Katherine, as to there having been any altercation between Edith and her father.

An autopsy performed on the body of the deceased disclosed three wounds upon the head. The first was a fairly clean cut three-fourths of an inch long commencing one inch above the hair margin and extending down through the entire scalp to the bone. The skull was not fractured. One of the other wounds was on the left side of the head and the other was on the right. They were not cuts but more in the nature of severe bruises. There was likewise a slight bruise above the nose and both eyes were somewhat swollen and bruised. The deceased had also sustained a bruise on the left forearm and a slight cut on the right little finger. According to the physicians, death was caused by a brain hemorrhage attributable to the wound just above the forehead and first described.

While there is some conflict in the details, the testimony of Edith, her mother and sister is substantially in accord. They say that Edith returned home about 1:00 o'clock in the morning and prepared to retire. She looked under the couch on which she slept to get her bed covers but found that they were not there. She then started into her father's room for the necessary covering and was warned by her younger sister not to go in there as her father was drunk, had been quarreling with her mother and had threatened to run the latter away from home the next day. To this Edith replied: "That doesn't make any difference. It's not the first time he has been drunk. He is not going to run mama off."

Edith then procured her bed covers from her father's room and returned to her sister's room and began talking to the latter. Her father was then moving around in his room and muttering to himself. He said something about whipping Edith for having stayed out so late. Despite her remonstrances that she had been out with his nephew and her first cousin, he proceeded to attack her. They were then in the kitchen. He first picked up a chair but at her command dropped it. He then grabbed a butcher knife, which she

attempted to take away from him. The knife dropped from his hand and the younger sister secured and hid it behind the clock: In the meantime he had. seized Edith by the hair. In the ensuing scuffle they overturned a bucket of water and knocked several kitchen utensils from the wall. Having broken loose Edith went into her mother's room, but was followed by her father who renewed the altercation. He seized her by the neck or near the throat and pushed her over a chair and she fell to the floor. She felt something at her back, reached for it and found that it was a shoe. This she grabbed and struck several times in his direction in the effort to free herself from his grip. As soon as her father released her she dropped the shoe, ran out of the front door between her home and that of Chant Kelly, her next door neighbor. Her clothes had been almost torn from her body. She went to the side entrance of the house and requested that her sister bring her shoes and clothes.

Just about this time Mr. Kelly appeared on the scene and offered his assistance. But this she declined as she did not wish her neighbors to know of the family difficulties and did not suspect that her father had been seriously hurt.

Shortly after Mr. Kelly's visit the mother and younger sister succeeded in quieting the father and getting him to bed. Mrs. Maxwell found that her husband was bleeding from his head wounds and washed the blood from his face. Mary Katherine mopped up the water from the overturned bucket and scrubbed from the floor the blood spots.

Before retiring the father's bloody shirt was removed and by Mrs. Maxwell put in the stove (in which there was then no fire), along with some powdered carbide which her husband had overturned.

About thirty minutes after the altercation had ended, the household had quieted down and the parties had retired, Mr. Maxwell arose from his bed and went out on the porch to get a drink of water. He was heard to fall. His wife went immediately to his assistance and found him lying unconscious in the doorway leading from the kitchen to the porch, with his head near the meat block as above described.

It will be observed that except in the one particular as to whether the deceased was drunk at the time of the altercation, this story of the witnesses for the accused is not materially at variance with that of the Commonwealth's witnesses.

But the Commonwealth lays great stress on certain additional circumstances as showing the testimony of Mrs. Maxwell and her two daughters was unworthy of belief, and as demonstrating that the accused was guilty of first degree murder.

A search of the premises on the day following the killing revealed a blood stained pillow slip and other bloody bed clothing buried under some soiled clothes in a clothes basket or barrel on the porch. It is argued that a concealment of these bloody bed clothes shows a guilty conscience on the part of some one. Mrs. Maxwell testified that she put the articles in this, the usual receptacle for the soiled clothes. This is not controverted. There is no evidence that the accused even knew of the disposition of these articles. In view of the fact that Mrs. Maxwell has likewise been indicted for the murder of her husband, is it possible that she would have assumed responsibility for the concealment (granting it to be such) of this bed clothing, if, in fact, Edith had thus attempted to dispose of it?

The same is true of the bloody shirt which Mrs. Maxwell admitted she had put in the stove and later burned.

It is next said that the evidence shows that the accused had a feeling of hatred toward her father, as the result of which she wilfully, premediatedly and with malice aforethought killed him. There is testimony that the father had frequently reprimanded her for what he considered to be her improper conduct in staying out late at night with men. At times he even threatened to whip her for such acts. All of this she resented, and not entirely without cause since the evidence does not disclose that she was guilty of any more reprehensible conduct than keeping late hours with young men.

When these occasions arose the accused undoubtedly, as the evidence shows, assumed a defiant attitude towards her

father and even gave vent to her feelings in what may be termed wild and unguarded remarks. But the chances are that such were soon forgotten by both the accused and her father.

Furthermore, the evidence clearly shows that some of the so-called "threats," on which the Commonwealth lays the greatest emphasis, were made in jest when she was being taunted by her young companions as to what punishment her father would probably inflict upon her for driving late at night with a young man, or like conduct.

And not without significance is the fact that nearly all of the "threats" were made a year or more previous to the killing.

The general rule is thus laid down in 13 R. C. L., section 216, page 912: "In almost any situation—whether the fact of the killing is denied, or whether self-defense is pleaded, or whether it is contended that by reason of provocation the killing is reduced to manslaughter—proof of the previous relations of the prisoner and the deceased, whether friendly or hostile or whatnot, is relevant and competent. Quarrels, altercations and hostile acts, ordinarily are provable to show animus, but such proof must not relate to a time too remote from that of the fatal encounter." See also, *Evans* v. *Commonwealth*, 161 Va. 992, 1007, 170 S. E. 756, and cases there cited.

While the fact that some of the remarks attributed to the accused were made more than a year previous to the killing does not render them inadmissible, as claimed by the accused, it may weaken, in the minds of the jury, the probative value of the words spoken. Wigmore on Evidence (2d Ed.), volume I. section 105, page 340; *Redd* v. *State*, 68 Ala. 492, 496; *State* v. *Merrick*, 172 N. C. 870, 90 S. E. 257.

The Commonwealth next argues that it is highly improbable that the wounds were inflicted with the heel of a shoe, as testified to by the accused. Indeed, there is an insinuation in the cross-examination of the accused, her mother and sister, and in the brief of the Attorney-General, that the blows were struck with some other instrument,—a hatchet or hammer, per-

haps,—which was thrown into the river running within a few feet of the rear of the Maxwell residence. There was some intimation that a smoothing iron had been used to strike the deceased.

Except for the nature and extent of the fatal wound itself there is no ground for these suggestions. No other weapon of any kind was in any way connected with the killing. No hammer or hatchet was found. The smoothing iron was in evidence at the trial and bore no marks of suspicion. Furthermore, the physicians who testified for the Commonwealth admitted that it was possible to have inflicted the wounds with the heel of the shoe as claimed by the accused.

The record shows that the deceased came to his death by blows inflicted by the accused. The killing was done either in the manner detailed by the accused and her witnesses or in some other way which is unexplained.

In *Hannah* v. *Commonwealth*, 153 Va. 863, 869, 149 S. E. 419, 421, Mr. Justice Holt said: "In Virginia murder is by statute divided into two classes. Every unlawful homicide is presumed in law to be murder in the second degree; that is to say, it is presumed to have been done with malice. To elevate the offense to murder in the first degree, the Commonwealth must in addition show that it was done deliberately, but whether it be first or second degree murder, malice either express or implied must appear. There can be no murder without it." See also, *Puckett* v. *Commonwealth*, 157 Va. 800, 160 S. E. 19.

In *Mercer* v. *Commonwealth*, 150 Va. 588, 594, 142 S. E. 369, 370, Chief Justice Campbell said: "In *Litton's Case*, 101 Va. 833, 44 S. E. 923, however, it is held that, when the Commonwealth has proven the commission of a homicide, and has pointed out the accused as the criminal agent, then it may rest its case, and unless the accused shows circumstances of justification, excuse, or alleviation, a verdict of murder in the second degree will be warranted." See also, *Adams* v. *Commonwealth*, 163 Va. 1053, 1061, 178 S. E. 29.

If there is a reasonable doubt as to whether the accused is guilty of murder in the first or second degree, that doubt

must be resolved in her favor. *Dingus* v. *Commonwealth*, 153 Va. 846, 853, 149 S. E. 414.

■ True it is the jury has declined to accept the story of the accused and her witnesses that the killing was in self-defense. This they had the right to do. While their story was not controverted by any direct testimony, yet there was evidence of circumstances affecting the credibility of the witnesses themselves and casting a doubt on the probability of their account of the killing. All of these made the defense of justifiable homicide, as detailed by the accused and her witnesses, a question for the jury under the principles laid down by Chief Justice Campbell in *Puckett* v. *Commonwealth*, 157 Va. 800, 808, 809, 160 S. E. 19.

■ But this does not mean that the jury had the right under the evidence to find the accused guilty of a "wilful, deliberate and premeditated killing"—that is, murder in the first degree. We think the evidence as disclosed in the record before us is insufficient to sustain a verdict of murder in the first degree. On it the jury had the right to find the accused guilty of murder in the second degree but nothing more.

It follows that the trial court erred in not setting aside the verdict and granting the accused a new trial.

■ We find no merit in any of the other assignments of error. The claim that the short form of indictment, drawn according to Code, section 4865 (as amended by Acts 1930, chapter 238), and under which the accused was tried, does not give sufficient notice of the cause and nature of the accusation, guaranteed by section 8 of the Virginia Constitution, is, we think, sufficiently answered by what Mr. Justice Hudgins said in *Hurd* v. *Commonwealth*, 159 Va. 880, 884, 885, 165 S. E. 536, and in *Bausell* v. *Commonwealth*, 165 Va. 693, 695, 181 S. E. 453, 459. What was there said need not be repeated here.

■ After the writ of error was granted in this case the petitioner applied to the judge of the trial court for bail for her appearance before the trial court upon the final determination of her cause. To the judgment refusing such bail a writ of error was awarded.

The petition and record in that matter presented this question: Did the trial court err in refusing to admit the accused to bail after she had been convicted of murder in the first degree, and pending the determination of her cause on appeal?

But since the judgment of conviction must be reversed and the cause remanded for a new trial, the situation has changed and that question has now become moot. Should the accused hereafter renew her application to the judge of the trial court, the latter will be confronted with a situation quite different from that found in the present record. As to what action he should then take, we, of course, express no opinion.

The writ of error granted in the matter of the application for bail will be dismissed.

The judgment of conviction of murder in the first degree will be set aside and the petitioner awarded a trial *de novo*.

*Reversed and remanded.*

HOLT, J., dissenting.

I am compelled by the record to dissent. That Edith Maxwell killed her father is no longer questioned. The issue before us turns upon the grade of that offense. Where the evidence without more shows that A killed B, murder in the second degree is presumed. But this is rebuttable presumption and if it is made to appear that the killing was wilful, deliberate and premeditated, then it is murder in the first degree. Code, section 4393. We frequently have had occasion to define premeditation.

"To constitute a wilful, deliberate and premeditated killing, it is not necessary that an intention to kill should exist for any particular length of time prior to the actual killing; it is only necessary that such intention should come into existence for the first time at the time of such killing or any time previously." *Wright's Case*, 33 Gratt. (74 Va.) 880, 893, opinion by Moncure, P.

"There can not be any doubt, that at common law, if one man kills another with a previously formed design to kill, that is murder, although the design may have been formed

only the moment before the fatal act is committed." *White-ford* v. *Commonwealth*, 6 Rand. (27 Va.) 721, 722, 18 Am. Dec. 771.

"No time is too short for a wicked man to frame in his mind a scheme to murder." Smith's Trial, page 230.

"If the defendant has time to think and did intend to kill for a minute, as well for an hour or a day, it is a willful, deliberate and premeditated killing." Cited with approval in note appended to *King* v. *Commonwealth*, 2 Va. Cases (4 Va.) 78. *Brown's Case (Com.* v. *Brown)*, 90 Va. 671, 19 S. E. 447, opinion by Lewis, P.; First Wharton's Criminal Law (11th Ed.) page 592.

It is the will and purpose to kill and not the interval in time which fixes the grade of the offense.

Evidence to establish this "is generally a question which lies *peculiarly* in the province of the jury" (Italics supplied). Kelly, P., in *Bryan* v. *Commonwealth*, 131 Va. 709, 714, 109 S. E. 477, 478.

We have here a verdict of murder in the first degree which bears the imprimatur of the trial judge, of whom it may be said in passing, he presided with distinguished ability and with the utmost impartiality, to all of which the record bears abundant testimony.

What feeling did Edith Maxwell cherish for her father? What affection or animosity did she cherish?

The killing occurred on Saturday night, July 21, 1935.

Ruth Baker was Edith's roommate at Radford Teacher's College during the session 1933-34. She tells us that time and again she heard Edith speaking of her father say, "I'll kill him."

Everett Holyfield, testifying in this cause on the 18th day of November, 1935, tells us that he lives at Pound, the home town of the accused, has known her for the past ten years, and that somewhere about a year ago she said to him in speaking of her father, that "she hated him so she couldn't keep from laughing if she seen him laid out dead."

Conrad Bowling tells us that about a year ago he and Edith with a party of friends in an automobile passed· her father

and by way of teasing said that he would whip her when she came back, to which she replied, "I would just like to see him try it," and that she would kill him and she would be glad if he was dead. The witness told her that she should be ashamed of herself and she answered, "There wasn't any need of being ashamed, it was the truth."

Chant Kelly said that about a year ago he heard Edith and her father quarreling, "she called him an old devil, I remember. She said she would bust his brains out," but that the father did not talk back to her.

While it is true that there is quite an interval of time between the making of these statements and the homicide, there is nothing to show any change in the relationship between this father and daughter.

J. L. Sowards tells us that on this Saturday afternoon Edith met one Arch Vance in the street and stood by him in an affectionate manner with their bodies touching. Her father said something, which must have been a remonstrance, for G. C. Branham heard her reply, "If you don't like it what are you going to do about it?"

Plainly the jury had ample reason to believe that Edith disliked her father and resented his attempts to control her.

What manner of man was this father? The mother tells us:

"Well, when he was sober I never heard a word out of him. He was just as smooth as could be with her and she was with him, but when he come in drinking he wasn't that way,— always picking a fuss and didn't want her out or to go anywhere or to no neighbor's home or no where."

Edith herself said:

"Well, Mr. Greer, when my daddy was sober, you would never know he was around the house except when he ate, and when he was drunk he would come in and there wasn't anybody else at home except my daddy. He always wanted to pick a fuss or kick one of the children or do something to mother."

It is contended that he was drunk when he was killed. That night Edith drove to Wise with her cousin. The mother tells us that her husband came home about ten-thirty o'clock,

remained for a short time, went out and came back about twelve-thirty.

Vern Hubbard said that she and her sister passed Trigg Maxwell on the street near their home in Pound about a quarter before twelve. They asked him what time it was. He replied, "I will tell you in a few minutes." He took out his watch and said, "It is fifteen minutes to twelve." Witness had known him all of his life and saw then no evidence of drinking.

Sowards kept a restaurant in town. Maxwell was in his place at twelve-thirty or a little after and bought a bottle of beer. He was then "perfectly sober."

Ned Deaton saw him about twelve-thirty o'clock and talked with him. He tells us that "he was perfectly sober so far as I could tell. If he had been drinking I couldn't detect it anyway." To the same effect is the evidence of Hazel Sturgill.

From this it is plain that the jury had reason good and sufficient to discredit the testimony of Edith and her mother and to believe that Maxwell was sober when he was killed. Mrs. Maxwell tells us that her daughter came back shortly after twelve-thirty.

Mr. Chant Kelly, who lives next door to the Maxwells and who has a small drug store, on this night had gone to bed but was reading and not asleep. At ten minutes past one what he described as a "racket" started up. Feminine voices were heard quarreling and apparently cursing. Then Trigg Maxwell began to call out "O, Lordy" together with other undistinguishable words. This continued, he estimates, for about eight minutes. Made anxious he went over to his home but these outcries had ceased before his arrival. In answer to inquiries, Edith, speaking from a latticed porch, said, "There is no fire out here, you needn't be a-coming." He offered to help and said that he wanted to know what was going on. She told him, "When we want you or anything you have got we will call for you, go home." This she repeated and he then slowly and against his will went away. About this time the radio started up in full blast. Kelly returned home and in something like twenty-five minutes Mary Katherine, Edith's young sister, ran

over and told him that her daddy was dying. He went back with her and saw both Edith and her mother, all of whom undertook to explain the situation, and said that Trigg Maxwell, drunk, had fallen against the meat block and killed himself. He was dressed in his underclothes and lay with his head by the block and his feet in the kitchen. Kelly and Dr. Sikes, who had come in, did what they could for him but he died within a short time. There was some blood on the porch floor and on the kitchen floor. Apparently there had been an attempt to wash it away. This witness examined the meat block and saw no signs of blood or hair about it.

Verna Hubbard, a sister-in-law of Chant Kelly and who was then in his home, heard a car drive up and heard Edith go into the house. "I heard a fuss start just as soon as she got in the house." She also heard Trigg Maxwell call out and groan as if he were hurt. She heard Mary Katherine say that her father had fallen against the meat block and had killed himself.

Martha Strange, another sister-in-law of Kelly, also was staying at his home, went over to the Maxwell house and heard Mrs. Maxwell say in Edith's presence that Mr. Maxwell was going for a drink of water, fell and hit the meat block.

J. L. Sowards, another witness, was there and heard Edith say that her father was drunk and fell against the meat block.

Edith was arrested the next day and again protested her innocence, and again said that her father was drunk and fell and had killed himself.

Dr. Tudor, who with Dr. Foust made a post mortem examination of the body, was asked what produced death, and answered, "licks on the top of his head," and said that "there were big blood clots at the base of the brain." This examination showed that there was a wound about the center of the front part of the head extending longitudinally through the entire scalp and through the covering to the bone. There were two other scalp wounds of less moment, one on the right side, an inch and a quarter long, and one on the left side a half inch wide and an inch and a quarter long. There was a bruise three or four inches long on the left fore arm, and a small cut on the back of the right little finger. Both eyes

were swollen; the right eye was considerably swollen and there was a bruise about the nose. The skull itself was not fractured, but these physicians were of opinion that it was the center wound which caused death. Dr. Foust said that, "The scalp is right tough and usually it takes somewhat of a sharp instrument—a blunt instrument can cut the scalp if it is hit with considerable force, but the scalp is considered to be right tough." A shoe was shown to Dr. Tudor, who was asked if these wounds could have been made with it. He answered, "I think it could if the force was sufficient. It would have taken a tremendous amount of force."

Upon reflection, the accused reached the conclusion that her first account of her father's death put an undue strain upon credulity. One could not seriously ask a jury to believe that a trail of blood from the kitchen to the porch and body wounds in divers places were the result of stumbling against a meat block, and so this story manifestly false has been abandoned in toto. Not only was it false, but it was a product of a conference between mother and daughter, who then proceeded to drill this made-up story into the younger sister.

In such circumstances a jury was well warranted in paying no further attention to the evidence of these witnesses.

In *Clopton's Case,* 109 Va. 813, 818, 63 S. E. 1022, 1023, Judge Keith quotes with approval from Proffatt on Jury Trial, section 363:

"The general rule, that where unimpeached witnesses testify positively to a fact, and are uncontradicted, the jury are not at liberty to discredit their testimony, is subject to exception, as where the statements of the witness are grossly improbable, or he has an interest in the question at issue. However well settled the rule may be that the credibility of a witness is for the jury, the judge has power to instruct them as to what circumstances are to be unfavorably considered in their estimation of his evidence. So the testimony of a witness may be wholly rejected by a jury, if from his manner and the improbability of his story or his self-contradiction in the several parts of his narrative, the jury becomes convinced that he is not speaking the truth; and this is true although he

be not attacked in his reputation, or contradicted by other witnesses."

The substance of this rule we have many times approved. *Metropolitan Life Insurance Co. v. Botto*, 153 Va. 468, 479, 143 S. E. 625, 154 S. E. 603; *Puckett v. Commonwealth*, 157 Va. 800, 160 S. E. 19; *Standard Oil Co. v. Davis*, 157 Va. 709, 162 S. E. 29; *Goodloe v. Smith*, 158 Va. 571, 164 S. E. 379.

Let us look for a moment to the testimony of the accused. She has undertaken to tell us in detail what happened on the night of July 21st. She reached home and found her father drunk and quarreling. He threatened to whip her and run her mother off of the place. She told him that he could whip her but he could not run her mother away. He thereupon grabbed a chair, but she said, "Don't do that," and he set it down. A butcher knife lay on the kitchen table. He picked it up and came towards her. "I said, 'Poppy, don't stob me.' By that time Mammy and Mary Katherine both jumped up, and when they jumped up he dropped the knife, and when I looked down to see the knife he grabbed me by the back of my head like that and I had my head down. * * * I tried to get his hands loose from my hair and I couldn't. He kept pulling my hair and I kept pulling at his hands. Every time I would do that it would pull my hair. He kept pulling me backwards into the kitchen." She continues to tell us about the manner in which her hair was pulled and tells us that some of it was pulled out. In the struggle he ran into a little washstand, which struck him about his knees. He turned her hair loose and sat down. In a short time she started to her bed room when he made another lunge at her and said, "I can show you I will whip you." He grabbed her with both hands and pushed her back and over a chair at the foot of her mother's bed. This threw her. "I fell on my right shoulder blade. There was something under there and it was hurting, and I reached back to see what was hurting me and I was trying to keep him off, too, and when I pulled it out I felt it and knew it was a shoe, and he said, 'Edith, I am going to finish you." He was choking me and I didn't know

what to do. * * * I was afraid he was going to hurt me. I struck at him and I don't know how many licks I struck *coming up.*" (Italics supplied). She was asked if he still had her by the throat when she got hold of the shoe and answered, "Yes, sir." Such is the substance of her statement. It bears upon its face evidences of inherent improbability; a jury could see this as others could. Immediately after this encounter a host of witnesses gathered. None of them tell us about disheveled hair which would ordinarily have been in evidence immediately after such an encounter. We are told that her father was choking her and pushed her in this manner to the floor, but no one tells us of seeing any finger prints upon her throat. The striking was done with this shoe. Dr. Foust's evidence is that the principal wound was one fairly clean and that the bruises on its sides were not clearly marked. "This must have been an instrument about an inch and a quarter long from the appearance of the wound, and it must have been somewhat sharp from the appearance, because the cut was fairly clean, and the bruise on either side of the cut was not very marked. It was not ragged—not much sign of hematomata around this first wound." Dr. Tudor said, "Well, the front one was cut, so in all probability it was made with an instrument that had a sharp surface or at least with a right angle surface. Of course it might have been possible for some other kind of instrument with a tremendously hard blow to have cut, but if it had been it would probably have fractured the skull."

This wound he said could have been inflicted with this shoe if sufficient force was used, "but it would have taken a tremendous amount of force." Dr. Foust said that the wound was "straight from the front backwards" and that if made with this shoe whoever made it must have been "standing at the side." The accused tells that she was either lying on her back at the time the wound was made or was struggling from a prone position, as she "was coming up." In neither position could an ordinary woman with this slipper have dealt a blow "with tremendous force."

The shoe itself is in evidence. It has a light wooden heel,

shaped as heels ordinarily are and would make an imprint not larger than a silver quarter, with the forward segment cut away. We can hardly dignify it by the name of shoe at all. It is a light and sleazy thing of straps and patches, scarcely as formidable as Cinderella's slipper. On its heel is no evidence of this use. If her hair had been disheveled, if her throat had been bruised, or if the slipper had been stained by wounds inflicted, we should in all probability have been told about it. She was not represented by neophytes but by able and experienced counsel.

The jury rejected her statement as it had ample right to do.

We do not know how he was killed. We do know that he was killed with a deadly weapon. A weapon in the hands of an ordinary person adequate to kill and which does kill is deadly. One does not have to use a battle-axe.

Of course much of this evidence is circumstantial. It usually is. He who cherishes a felonious purpose is not apt to talk about it.

The jury might have believed that this daughter whose relations with her father were anything but cordial came home and was upbraided by him for the lateness of her coming. She was angered by this and determined to put an end to it and did put an end to it, and gave thereafter an explanation which was wholly untrue. R. S. Hubbard was asked, "Did Anne Maxwell say to you, as you came here with her, 'God knows I never laid a hand on him. I begged for him all the time,'" and answered, "Yes, sir, she did."

This evidence went only to the credibility of Mrs. Maxwell. The jury held against her and was of opinion that she did make such a statement. She does, however, tell us that she begged her husband and her daughter to quit "scuffling." The mother and the daughter both said that Mr. Maxwell, when sober, was quiet and peaceful and a jury upon a conflict of testimony has found that he was sober on the night of his death.

It is argued that the court should have instructed the jury as to second degree murder and as to manslaughter. No such

instructions were requested. Counsel having gambled as to this can not now be heard to complain.

Other errors are assigned. For the sake of argument we might concede that some of them are well taken, but one can not read this record without being forced to the conclusion that the trial so far ·as the accused is concerned was pre-eminently fair and the verdict reached is amply sustained by the evidence. It has been aptly said that there is no such thing as a perfect trial. In cases drawn out and hotly contested borderline questions continually arise, as to which no two judges can be always in accord. Out of this situation our statute has come. Code, section 6331.

The state desires that substantial justice be administered and that it be administered with reasonable promptness.

In *Virginia Ry. & P. Co.* v. *Smith,* 129 Va. 269, 105 S. E. 532, 535, Judge Kelly said:

"The revisers, in section 6331 of the Code of 1919, in keeping with the modern trend of legislative and judicial policy, added a new clause to the old section (Code 1887, section 3449); and the statute now provides that 'No judgment or decree shall be reversed * * * for any error committed on the trial where it plainly appears from the evidence given at the trial that the parties have had a fair trial on the merits, and substantial justice has been done.' It is our purpose to vitalize this provision in its application and administration. Of course, there will always be room for doubt as to whether the right result has been reached when the evidence has been in serious conflict; but in causes triable and tried by juries 'substantial justice' in a legal sense has been attained when litigants have had one fair trial on the merits."

To summarize:

1. These facts are supported by disinterested testimony, by that of Edith Maxwell herself, and by that of witnesses tendered on her behalf. Edith Maxwell disliked her father and had many times threatened to kill him.

2. She did kill him.

3. She gives two accounts of the manner in which it was

done, one confessedly false, and the other manifestly improbable.

4. When a neighbor, coming in response to her father's outcry, offered to help and said he wanted to know what was going on, he was told to go home and that if he was wanted he would be sent for.

5. Efforts were made to hide the bloody clothes and to wash away blood stains on the floor.

6. Her hair was not disheveled by any assault made upon her.

7. There were no marks on her throat to show that she had been choked.

8. When sober, Trigg Maxwell was quiet and peaceable.

9. When sober, he was killed.

10. Trial counsel for the accused appear themselves to have believed that their client could be logically found guilty of first degree murder, if guilty at all, for they asked no instruction on less offenses.

In circumstances such as these summarized the authorities with one voice tell us that it is for the jury to fix the grade of the offence.

This was no back-woods inquisition. At the trial an able, impartial and experienced judge presided. The accused was represented by counsel eminently competent who interposed on her behalf every defense which could with propriety have been offered.

In *Poole* v. *Kelley*, 162 Va. 279, 173 S. E. 537, 543, we said:

"The record shows that the jury was fairly instructed, that the parties have had a fair trial upon the merits of the case and that substantial justice has been done. That is enough." *Sit finis litium.*

For reasons stated, I am constrained to dissent.

CAMPBELL, C. J., concurs in this dissent.